**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

|                                                        |     |                        |
| ------------------------------------------------------ | --- | ---------------------- |
|                                                        | :   |                        |
| ERNEST SIMURO, & ERNEST SIMURO                         | :   |                        |
| On behalf of K.S., a minor,                            | :   |                        |
|                                                        | :   |                        |
|     Plaintiffs,                    | :   |                        |
|                                                        | :   |                        |
| v.                                                     | :   | Case No. 2:13-cv-30    |
|                                                        | :   |                        |
| LINDA SHEDD, TOWN OF WINDSOR,                          | :   |                        |
| & DOES I through X                                     | :   |                        |
|                                                        | :   |                        |
|     Defendants.                    | :   |                        |
|                                                        | :   |                        |

## Opinion and Order

Plaintiffs Ernest Simuro and Simuro on behalf of his grandson, K.S., bring the present action against Defendants Linda Shedd, a former sergeant of the Windsor Police Department, the Town of Windsor, and Does I through X.[1]  In their amended complaint, Plaintiffs assert a number of claims pursuant to 42 U.S.C. § 1983 and Vermont state law.  The claims arise out of Simuro's arrest and prosecution based on allegations that he sexually assaulted his daughter and K.S., and the resulting seizure of K.S. by the Vermont Department for Children and Families.

Currently pending before the Court are (1) Defendant Town of Windsor's motion for judgment on the pleadings; (2) Defendant

---

[1] On September 4, 2015, the Court granted Plaintiffs' unopposed motion to dismiss all claims against Defendants Erin Keefe and Janet Melke, social workers employed by the Vermont Department for Children and Families.  *See* ECF No. 145.

Town of Windsor's motion for summary judgment; and (3) Defendant Shedd's motion for summary judgment.  For the reasons set forth below, the Court **grants** the Town of Windsor's motion for judgment on the pleadings, and **grants in part and denies in part** Shedd's motion for summary judgment.  Because the Town of Windsor is dismissed from this case, the Court **denies** as moot its motion for summary judgment.

BACKGROUND

I.   **The Undisputed Facts**

Ernest Simuro has two children, Debra and Steven, whom he raised with his late wife Laureen in and around Windsor, Vermont.  Debra was born in 1985, and Steven was born in 1983.

In 2003, at the age of 17, Debra gave birth to a son, K.S. Debra developed a drug dependency prior to her pregnancy, and K.S. was born with heroin in his system.  From birth, K.S. lived with his grandparents, while Debra moved in and out of the family home.  In 2004, when K.S. was roughly 18 months old, the Probate Court for the District of Windsor appointed Simuro and Laureen as K.S.'s co-guardians.  Laureen later passed away from cancer in September 2007.

In February 2008, while residing at the Valley Vista Alcohol and Chemical Dependency Inpatient Treatment Center, Debra made claims to both the Windsor Police Department and the Vermont Department for Children and Families ("DCF") that Simuro

had sexually abused her since she was a child.  Debra further alleged that Simuro was K.S.'s biological father and that K.S. had told her that Simuro was physically abusive with him. Windsor Police Sergeant Linda Shedd responded to Debra's allegations of child abuse by visiting Simuro's home and speaking with K.S.  K.S. denied that Simuro had hurt him, and Shedd did not discover any physical evidence of abuse.  In addition, Windsor Police Sergeant Phil Call investigated Debra's claims of her own sexual abuse.  Call interviewed Debra and indicated in a written report that she recanted her accusations.[2]

Over the next two years, as Simuro cared for K.S., Debra continued to move in and out of the family home.  In October 2010, however, after discovering that someone had stolen K.S.'s ADHD medication, Simuro ordered Debra and her then-husband Michael Pitts to leave the house.  Debra was eight months pregnant at the time, and Simuro reported the incident to DCF. Due to a prior police report expressing concern that Debra was using illegal drugs during her pregnancy, DCF had already opened a case on Debra.  DCF social worker Erin Keefe had been assigned to that case.

On October 18, 2010, Keefe met with Debra at the motel where Debra was staying.  During their conversation, Debra told Keefe that Simuro had sexually abused her throughout her

---

[2] A DNA test conducted in 2011 confirmed that Simuro is not K.S.'s biological father.

3

childhood.  Debra also alleged that Simuro had sexually

assaulted K.S. and showed Keefe a video that she had taken of

K.S. approximately a year and a half earlier.  The video shows

K.S. playing in the bathtub while Debra asks him a series of

questions.  Their conversation proceeds as follows:

> Debra: You're recording.
> K.S.: I'm recording?
> Debra: Yup.  Hey buddy, what were you talking about
> earlier about penis in your butt?
> K.S.: There's a penis in my butt.
> Debra: There's a penis in your butt?
> K.S.: Yup.
> Debra: Did Grandpa stick his penis in your butt?
> K.S.: Uh-huh.  My name is Charlie.  See you later.
> (Unintelligible).  Bye.  Bye bye.
> Debra: No, [K.S.], Mommy's serious--did Grandpa stick
> anything in your butt?
> K.S.: Uh-yeah.
> Debra: Yes?
> K.S.: My penis.
> Debra: What?
> K.S.: My penis.
> K.S.: He stuck his penis in your butt?
> Debra: Yeah.

ECF No. 155-15, Video #1.  K.S. laughs throughout the video.

The following day, on October 19, 2010, Keefe filed a

report with DCF.  In her report, Keefe indicated that "Debbie is

concerned that [K.S.] is living with [Simuro]," and that

"Debbie . . . also stated that she had been sexually abused by

her father from the time she was young until she was 18."  ECF

No. 155-67 at 2.  With respect to the bathtub video, Keefe wrote

that "Mom said 'I want you to tell me [K.S.] what you just said

a minute ago.'  [K.S.] said 'granpa puts his penis in my butt.'"

4

ECF No. 155-67 at 2.  The report did not include any other
commentary regarding the video.  Keefe then contacted the
Windsor Police Department and gave Shedd a copy of her report.
Shedd was assigned to handle the case.

That afternoon, Keefe and Shedd each spoke with K.S. in two
successive interviews.  During Keefe's interview with K.S.,
which Shedd watched on a closed-circuit video in another room,
K.S. indicated that he felt safe at home with Simuro and that no
one had touched him anywhere that made him feel unsafe.  *See* ECF
No. 155-20.  K.S. further stated that Simuro did not give him
any bad touches other than "a spank . . . when [he's] bad."  ECF
No. 155-20 at 12.

Next, during his interview with Shedd, K.S. again indicated
that he felt safe at home, and he replied negatively to the
question of whether anyone ever touched him in the "area where
the bathing suit covers."  ECF No. 155-21 at 2.  Shedd later
gave K.S. a stuffed animal and asked K.S. to "show me what kind
of touching people touch you like."  ECF No. 155-21 at 6.  K.S.
responded, "Boing . . . like Grandpa . . . unpants my pants,
then he goes 'psst,'" while making a slapping motion against the
animal's rear.  ECF No. 155-21 at 6.  K.S. proceeded to clarify
that Simuro pokes his thumb "on the bum" and not *in* the bum, and
"on top" of his clothes and not *under* his clothes.  ECF No. 155-
21 at 6-7.  Finally, K.S. stated that Simuro pokes him *on* the

bum when he gets in trouble, and that nothing ever goes *in* his bum.  ECF No. 155-21 at 7.

Later that day, Shedd met with Simuro at the Windsor Police Department.  During an hour-long interrogation in which Shedd told Simuro that "we have [K.S] on videotape telling us that you put your penis inside his butt," Simuro repeatedly denied that he had ever touched K.S. in an inappropriate manner.  ECF No. 155-23 at 12.  Simuro acknowledged that he used his hands to bathe K.S., and he admitted that "it might be a little strange" that he typically washed K.S. in the evenings despite the fact that K.S. frequently wet the bed.  ECF No. 155-23 at 11.  Simuro went on to state, however, that with respect to bathing K.S., he has "never thought of it as sexual."  ECF No. 155-23 at 20.  In addition, Simuro agreed to take a lie detector test, permit a medical examination of K.S., consent to a search of his home computers, and take a DNA test to prove that he was not K.S.'s biological father.

At the conclusion of the interrogation, Shedd advised Simuro that he was being placed under arrest for sexual assault on a child and lewd and lascivious conduct with a child.[3]  Shedd

---

[3] The parties disagree as to whether Shedd called Debra to speak about the bathtub video prior to informing Simuro that he was under arrest.  According to Shedd's affidavit, she contacted Debra after completing her interrogation of Simuro, but before issuing Simuro a citation.  Shedd's affidavit indicates that Debra confirmed that she filmed the bathtub video in response to K.S.'s disclosure that "grampa puts his penis in my butt."  ECF No. 160-14 at 4. Simuro disputes that Shedd spoke with Debra prior to his arrest.  In support

informed Simuro that he was no longer free to leave, and issued
a citation requiring him to appear in court the next day.
Simuro was then released on his own recognizance.  As a
condition of his release, Simuro was prohibited from leaving
Windsor County without the court's permission.  He was further
prohibited from contacting K.S. or any other individual under
the age of 18.

Later that night, Shedd drafted a probable cause affidavit
in support of Simuro's prosecution.  In the affidavit, Shedd
notes that "Keefe states that she has . . . viewed the tape in
which KS tells his mother 'Grandpa put his penis in my butt.'"
ECF No. 160-14 at 1.  Shedd then briefly describes Keefe's
interview with K.S., and proceeds to characterize her own
interaction with K.S. as follows:

> I then return to KS with a Mother Goose stuffed
> animal.  KS immediately takes the goose from me and
> begins to look under her dress.  He then pulls down
> the stuffed animals [sic] undergarments as he states
> that 'grampa pulls my pants down' and then KS takes
> his hand and extends his thumb and shoves it into the
> backside of the goose as he tells me that 'grampa
> pokes me in the butt with his thumb.'  KS is very
> clear that Simuro pulls his pants down often and then
> pokes him in the butt as he demonstrates on the
> stuffed animal.  Soon after making that disclosure, KS
> states that he is done talking and wants to leave the
> interview room.

ECF No. 160-14 at 2.  The affidavit concludes with summaries of
Shedd's interrogation of Simuro and her alleged telephone call

---

of his position, Simuro cites Keefe's deposition, in which she states that
she does not recall Shedd making the call.  ECF No. 155-10 at 114.

with Debra.  When finished, Shedd submitted the affidavit to the State's Attorney's Office, and on October 20, 2010, the State charged Simuro with lewd and lascivious conduct in violation of 13 V.S.A. § 2602, as well as sex assault on a minor in violation of 13 V.S.A. § 3252(d).

Several days later, Keefe prepared an affidavit in support of a CHINS[4] petition seeking to place K.S. in the legal custody of DCF.  Simuro had moved out of his house to allow K.S. to continue living in the home with his uncle, Steven, and Keefe now asserted that Steven was an inappropriate caregiver.  In support of her position, Keefe stated that Steven "states a lack of belief that his father Ernest is a sexual abuser," and "is preventing any contact between [K.S.] and his mother."  ECF No. 155-72 at 4.  Keefe also expressed concern that she had no assurance that Steven would prevent Simuro from contacting K.S. Keefe attached Shedd's probable cause affidavit to her petition, which the State's Attorney's Office filed on October 24, 2010. The following day, the family court granted the State's request, and K.S. was placed in foster care for nearly a month before DCF permitted him to resume living with Steven.

On December 19, 2010, as Simuro's charges related to K.S. were pending, Shedd met with Debra, who again indicated that Simuro had physically and sexually abused her throughout her

---

[4] CHINS stands for "Child in Need of Care or Supervision."

childhood.   During her interview, Debra claimed that Simuro beat her "whenever he was in a bad mood.   Sometimes once a week.   Sometimes more."   ECF No. 155-6 at 1.   She further stated that Simuro raped her "at least once a month" from the time that she was 12 years old until her husband moved into the home.   ECF No. 155-6 at 2-3.   Debra reiterated her allegation that Simuro may be K.S.'s biological father, and stated that she had communicated Simuro's abuse to her ex-boyfriend Benjamin Harper and his mother, Dawn.

Over the next ten days, Shedd spoke with Benjamin, Dawn, and Nicole Boucher, an employee of Valley Vista.   Each of them stated that Debra had made allegations in the past about her father's abusive behavior.   According to Shedd, Benjamin stated that he did not report the accusations previously because he did not believe them to be true until Simuro was charged with sexually assaulting K.S.

On June 3, 2011, Shedd issued Simuro a citation for sexually assaulting Debra and for violating his conditions of release.   Shedd's affidavit in support of the sex assault charge indicates that probable cause arose from her conversations with Debra, Benjamin, Dawn, and Boucher.   As grounds for the COR violation, the affidavit notes that one of Simuro's conditions of release provided that he "must not be charged with or have probable cause found for a new offense while this case is open."

9

ECF No 160-38 at 5.  In addition, Simuro allegedly left Windsor County without permission and breached the condition prohibiting him from contacting minors.  The State subsequently charged Simuro with one count of violating his conditions of release and four counts of sexual assault on Debra.

Together with his attorney, Simuro challenged both the criminal charges brought against him and the DCF decision to substantiate the allegations that he had sexually abused K.S. At Simuro's request, DCF reviewed the bathtub video, the recorded interviews with K.S. and Simuro, and several other relevant documents, and concluded that it was "not appropriate for [Simuro's] name to be placed on the Vermont Child Protection Registry."  ECF No. 155-68 at 4.  The State's Attorney's Office also determined that Shedd's recitation of her conversation with K.S. was misleading, and it did not oppose Simuro's motion to dismiss the charges relating to K.S.  The criminal court granted that motion on August 9, 2011.  Several months later, on November 14, 2011, the State dismissed all remaining charges.

In February 2012, DCF permitted Simuro and K.S. to regain contact.  Debra and Michael Pitts subsequently relinquished their parental rights, and on July 31, 2012, Simuro adopted K.S.

## II.  Plaintiffs' Claims and the Pending Motions

In their amended complaint, Plaintiffs assert fourteen separate counts against Shedd, Keefe, Janet Melke, and the Town

of Windsor.  Because the Court has granted Plaintiffs' unopposed motion to dismiss all claims against Keefe and Melke, *see* ECF No. 145, twelve counts against Shedd and the Town of Windsor remain.

In Count I, Simuro asserts that Shedd violated 42 U.S.C. § 1983 by initiating his false arrest and malicious prosecution on the charges related to K.S.  Count II similarly alleges that Shedd violated 42 U.S.C. § 1983 by initiating Simuro's false arrest and malicious prosecution on the charges related to Debra.  Counts III, V, and VI[5] all relate to Simuro's separation from K.S.  In Counts III and VI, respectively, Simuro and Simuro on behalf of K.S. assert that Shedd violated 42 U.S.C. § 1983 by depriving them of their rights to familial association.  In Count V, Simuro on behalf of K.S. alleges that Shedd breached 42 U.S.C. § 1983 by causing K.S. to be unlawfully seized by DCF.

As to the remaining causes of action, Simuro brings Counts VII through XIII[6] against Shedd and the Town of Windsor pursuant to Vermont law.  Specifically, Simuro asserts claims of false arrest (Count VII), malicious prosecution (Count VIII), and gross negligence (Count IX)[7] based on the charges related to K.S.

---

[5] Count IV has been dismissed as it was brought solely against Keefe and Melke.  *See* ECF No. 74 at 25.

[6] Count XIV has also been dismissed because it was brought against only Keefe. *See* ECF No. 74 at 34.

[7] In its July 23, 2013 Order, the Court dismissed Count IX as it pertains to Shedd.  The claim is currently brought against only the Town of Windsor.  *See* ECF No. 29.

11

Simuro also alleges claims of false arrest (Count X), malicious prosecution (Count XI), and gross negligence (Count XII)[8] based on the charges related to Debra.  Finally, in Count XIII, Simuro asserts a claim of intentional infliction of emotional distress.

There are presently three motions pending before the Court. The Court begins by addressing the Town of Windsor's motion for judgment on the pleadings.  Because that motion is granted, the Town of Windsor's motion for summary judgment is denied as moot. The Court next considers Shedd's motion for summary judgment.

**DISCUSSION**

**I.   Defendant Town of Windsor's Motion for Judgment on the Pleadings (ECF No. 122)**

**A. Legal Standard**

In assessing a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), courts apply the same legal standard applicable to motions to dismiss under Rule 12(b)(6).  *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015).  Thus, in order to survive a Rule 12(c) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009).  A claim is facially plausible

---

[8] The Court also dismissed Count XII as it pertains Shedd in its July 23, 2013 Order.  Thus, that claim as well is brought against only the Town of Windsor. *See* ECF No. 29.

12

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

## B. Municipal Immunity

In its motion for judgment on the pleadings, the Town of Windsor acknowledges that there are two means by which a plaintiff may endeavor to hold a municipality liable for a tort allegedly committed by its employee.  First, a plaintiff may rely on the common law doctrine of respondeat superior.  Second, a plaintiff may invoke a statute such as 24 V.S.A. § 901a.  The Town of Windsor first directs its attention toward the doctrine of respondeat superior, arguing that municipal immunity bars Simuro from advancing his claims against the Town pursuant to such a theory.

"Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Doe v. Forrest*, 853 A.2d 48, 54 (Vt. 2004) (internal quotation omitted).  Here, as the Court has previously acknowledged, the parties do not dispute that "Shedd was acting within her authority as a law enforcement officer regarding the conduct asserted in the complaint."  ECF No. 29 at 6.  Indeed, "[c]onducting an investigation, making an arrest,

and participating in a prosecution are all duties within the scope of a law enforcement officer's authority." *Id.; see also Long v. L'Esperance*, 701 A.2d 1048, 1052 (Vt. 1997) (holding that police officer who made wrongful arrest was "acting within the scope of his authority").

Where a municipality faces suit under a theory of respondeat superior, however, Vermont law has long provided that municipal immunity may serve as a shield to liability. *See Morway v. Trombly*, 789 A.2d 965, 968 (Vt. 2001) (recognizing that "[m]unicipal immunity is a common-law doctrine dating back to the mid-1800s in Vermont"); *see also Decker v. Fish*, 126 F. Supp. 2d 342, 346 (D. Vt. 2000) (finding municipality immune from state law claims brought under the doctrine of respondeat superior). "Municipal immunity protects municipalities from tort liability in cases where the municipality fulfills a governmental rather than a proprietary function." *Sobel v. City of Rutland*, 60 A.3d 625, 630 (Vt. 2012) (internal quotation omitted). The rationale for distinguishing between those two functions is that "municipalities perform governmental responsibilities for the general public as instrumentalities of the state," whereas "they conduct proprietary activities only for the benefit of the municipality and its residents." *Hillerby v. Town of Colchester*, 706 A.2d 446, 447 (Vt. 1997).

Although the distinction between governmental and proprietary functions has been criticized as difficult to apply, *see, e.g.*, *Clain v. City of Burlington*, 202 F.2d 532, 533 (2d Cir. 1953), courts in Vermont have repeatedly found police work to be a governmental function.  *See, e.g.*, *Franklin Cnty. Sheriff's Office v. St. Albans City Police Dep't*, 58 A.3d 207, 214 (Vt. 2012) ("[T]he provision of police services in Vermont occurs outside the realm of commerce because it involves no interchange of goods or commodities on the open market.  It is a government function provided only by governmental entities for the benefit of the public."); *Carty's Adm'r v. Vill. of Winooski*, 62 A. 45, 46 (Vt. 1905) ("One of the powers of government inherent in every sovereignty is the governing and regulating of its internal police. . . . [T]his power may be delegated by a state to municipal corporations, to be exercised within their corporate limits; but, whether the power be so delegated or otherwise, it is a governmental function, founded upon the duty of the state to protect the public safety, the public health, and the public morals."); *see also Kucera v. Tkac*, 2013 WL 1414441, at *11 (D. Vt. Apr. 8, 2013) ("Courts in Vermont have consistently found that police work is a governmental function."); *Decker*, 126 F. Supp. 2d at 346 ("[T]here can be little question that police work is a quintessential governmental function.").  Accordingly, to the

15

extent that Simuro brings his claims against the Town of Windsor under the theory of respondeat superior, such claims are barred by the doctrine of municipal immunity.[9]

## C. Section 901a

Beyond the doctrine of respondeat superior, 24 V.S.A. § 901a provides an additional legal avenue through which a municipality may be held liable for the torts of its employees. Pursuant to Section 901a,

> (b) When the act or omission of a municipal employee acting within the scope of employment is alleged to have caused damage to property, injury to persons, or death, the exclusive right of action shall lie against the municipality that employed the employee at the time of the act or omission; and no such action may be maintained against the municipal employee or the estate of the municipal employee.

> (c) When a municipality assumes the place of a municipal employee in an action as provided in subsection (b) of this section, the municipality may assert all defenses available to the municipal employee, and the municipality shall waive any defense not available to the municipal employee, including municipal sovereign immunity.

---

[9] In his response brief, Simuro argues that municipal immunity does not shield the Town of Windsor from liability for his state constitutional claims.  He cites *In re Town Highway No. 20*, 45 A.3d 54 (Vt. 2012) in support of his position.  In *In re Town Highway No. 20*, the Vermont Supreme Court determined that the Common Benefits Clause in Article 7 of the Vermont Constitution provides a self-executing private right of action, and that litigants may recover monetary relief for such a claim.  45 A.3d at 78.  The court further held that, under the circumstances of that case, the Town could not maintain a municipal immunity defense in light of its violation of the plaintiff's Article 7 rights.  *Id.* at 76.  Because the holding *In re Town Highway No. 20* was limited to Article 7 violations, and because there are alternative remedies to meaningfully compensate Simuro's injuries, *see id.* at 67-71, the Court declines to extend the logic of *In re Town Highway No. 20* to the claims presented in this case.

The protection afforded to municipal employees under Section 901a(b) does not extend "to an act or omission . . . that was willful, intentional, or outside the scope of the employee's authority."  24 V.S.A. § 901a(e).

As noted above, the parties do not dispute that Shedd was acting within the scope of her authority as a law enforcement officer when she engaged in the conduct at issue.  The parties do dispute, however, whether her actions were "willful" or "intentional" within the meaning of 24 V.S.A. § 901a(e).

With respect to Simuro's claims of gross negligence, the Court has previously ruled that "gross negligence 'falls short of being such reckless disregard of probable consequences as is equivalent to a wil[l]ful or intentional wrong.'"  ECF No. 29 at 6-7 (quoting *Shaw v. Moore*, 162 A. 373, 374 (Vt. 1932)). Accordingly, because Section 901a requires willful or intentional conduct to hold a municipal employee individually liable, Shedd's claims of gross negligence "must be brought exclusively against the Town of Windsor."  ECF No. 29 at 8. Section 901a(c) precludes the Town of Windsor from raising a municipal immunity defense to those claims.

Regarding Simuro's remaining claims against the Town, however, Section 901a does not afford Shedd similar protection, for false arrest, malicious prosecution, and intentional infliction of emotional distress are all properly classified as

17

intentional torts.  As the Town of Windsor notes, "[w]here the meaning of a statute is plain, there is no necessity for construction and the court is required to enforce the statute according to its express terms.  Moreover, there is a presumption that the ordinary meaning of the statutory language was intended by the legislature." *State v. Hull*, 143 Vt. 353, 354 (Vt. 1983).

Here, there is no doubt that claims of false arrest, malicious prosecution, and intentional infliction of emotional distress all require a showing of an intentional or willful act. *See Connary v. Field*, No. 2012-276, slip op. at 3 (Vt. 2013) ("false arrest requires showing that defendant intended to confine plaintiff without plaintiff's consent, and that confinement was not otherwise privileged"); *Anello v. Vinci*, 458 A.2d 1117, 1119 (Vt. 1983) ("[t]o recover for malicious prosecution the claimant must establish that the person against whom the claim is asserted instituted the proceeding against him (1) without probable cause, (2) with malice, and that (3) the proceeding terminated in claimant's favor"); *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978) (holding that IIED claim requires proof of "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous

conduct."). In addition, contrary to Simuro's assertion, there is no language in the statute suggesting that Section 901a contemplates a "darker" mental state than is typically associated with willful or intentional actions. Thus, because Section 901a(e) plainly excludes "willful" and "intentional" acts from the scope of the statute's mandate, the Town of Windsor does not assume Shedd's place in Simuro's claims for false arrest, malicious prosecution, and intentional infliction of emotional distress under Section 901a(b). *See Shatney v. LaPorte*, No. 5:12-cv-23, slip op. at 23 (D. Vt. Nov. 7, 2014) ("Section 901a also does not protect [defendant police officers] from plaintiffs' remaining state-law claims against them-- malicious prosecution and intentional infliction of emotional distress--because these are intentional torts. Such claims must be brought against the individual defendants."). The Town of Windsor is therefore shielded from liability by the doctrine of municipal immunity, and Simuro may pursue those claims against Defendant Shedd alone.[10] Accordingly, the Court **grants** the Town

---

[10] Simuro makes an additional argument that the Town of Windsor may be liable for Shedd's intentional torts pursuant to 24 V.S.A. § 901. Section 901 provides that actions brought against "any appointed or elected municipal officer" shall be brought against the municipality, and that "[t]he municipality shall assume all reasonable legal fees incurred by an officer when the officer was acting in the performance of his duties and did not act with any malicious intent." Even assuming that Shedd is an appointed municipal officer within the meaning of the statute, however, Section 901 does not provide for the waiver of municipal immunity. Thus, to the extent that the Town of Windsor faces liability for Shedd's actions pursuant to Section 901, municipal immunity prevents any claims from moving forward under such a theory.

of Windsor's motion for judgment on the pleadings with respect
to Counts VII, VIII, X, XI, and XIII of the amended complaint.

### D. Gross Negligence Claims

Lastly, the Town of Windsor asserts that it is entitled to
judgment on the pleadings on Simuro's claims of gross negligence
because Shedd did not owe Simuro a legally enforceable duty of
care under the circumstances of this case.

Pursuant to Vermont law, a claim of negligence requires a
showing that the defendant owed the plaintiff a legal duty, that
the defendant breached that duty, that the breach was the
proximate cause of the plaintiff's injury, and that the
plaintiff suffered actual loss or damage. *Endres v. Endres*, 968
A.2d 336, 340 (Vt. 2008). "Duty, the first element, is central
to a negligence claim, and its existence is primarily a question
of law." *Id.* As plaintiff, Simuro bears the burden of
establishing the duty's existence. *See Iqbal*, 556 U.S. at 678
(holding that although courts must accept all of a complaint's
factual allegations as true, this tenet "is inapplicable to
legal conclusions," and thus, "[t]hreadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, do not suffice.").

Here, Simuro argues that Shedd had "duties to arrest Mr.
Simuro only upon probable cause, and to conduct proper
investigations." ECF No. 134 at 19-20. Simuro cites no

authority recognizing the existence of such duties in the context of Vermont state tort law, however, and instead points solely to the prohibition against unreasonable seizures expressed in the Fourth Amendment to the U.S. Constitution and Article 11 of the Vermont Constitution.  In addition, of those jurisdictions that have addressed the question at bar, the Court is unaware of a single case holding that such legal duties exist.  *See, e.g.*, *Pourny v. Maui Police Dep't*, 127 F. Supp. 2d 1129, 1146 (D. Haw. 2000) (holding that plaintiff's negligence claim fails as a matter of law because "[t]here is no 'duty' to not arrest without probable cause."); *Smith v. State*, 324 N.W.2d 299, 300 (Iowa 1982) (declining to recognize "an independent tort for negligent investigation of crime by law enforcement officers."); *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 744 (N.Y. App. Div. 1979) (rejecting plaintiff's negligence claim even though she had presented a prima facie case that her arrest was unsupported by probable cause on the grounds that "she must proceed by way of the traditional remedies of false arrest and imprisonment and malicious prosecution.").

Because Vermont courts have yet to address the question of whether law enforcement officers have legal duties to conduct reasonable criminal investigations and effect arrests only upon probable cause, and because courts in other jurisdictions have rejected the existence of such duties, the Court declines to

find that those duties exist in the context of Vermont tort law.
Accordingly, the Court **grants** the Town of Windsor's motion for
judgment on the pleadings with respect to Counts IX and XII of
the amended complaint.  The Town of Windsor is therefore
**dismissed** from this case, and its motion for summary judgment is
**denied** as moot.

## II.  Shedd's Motion for Summary Judgment (ECF No. 141)

### A. Legal Standard

The Court turns next to Shedd's motion for summary
judgment.  As is well known, summary judgment is appropriate "if
the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material
fact exists "if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party."  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly,
when ruling on a motion for summary judgment, courts must
examine the evidence in the light most favorable to the
nonmoving party, *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir.
2003), and "resolve all ambiguities and draw all permissible
inferences in favor of the party against whom summary judgment
is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight
Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Although the moving party bears the burden of establishing the absence of any genuine issue of material fact, *Anderson*, 477 U.S. at 256, in defending against a motion for summary judgment, the nonmoving party may not rely on "mere conclusory allegations, speculation or conjecture," *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  Rather, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In deciding a motion for summary judgment, the trial court's function "is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### B. Simuro's False Arrest and Malicious Prosecution Claims Based on the Charges Related to K.S.

Shedd first moves for summary judgment on Simuro's 42 U.S.C. § 1983 and Vermont state law claims of false arrest and malicious prosecution based on the charges related to K.S.

An action for false arrest brought under § 1983 requires a plaintiff to show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). A false arrest action is substantially the same under Vermont state law, which necessitates proof that the "defendant intended to confine plaintiff without plaintiff's consent, and that confinement was not otherwise privileged." *Connary v. Field*, No. 2012-276, slip op. at 3 (Vt. 2013) (citing *Ackerson*, 702 F.3d at 19). As to a claim for malicious prosecution, such an action brought pursuant to § 1983 is governed by state law. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). Vermont law provides that a plaintiff filing suit for malicious prosecution must establish that the defendant "instituted the proceeding against him (1) without probable cause, (2) with malice, and that (3) the proceeding terminated in claimant's favor." *Anello v. Vinci*, 458 A.2d 1117, 1119 (Vt. 1983).

In her motion for summary judgment, Shedd asserts that the undisputed facts establish that there was probable cause to arrest and prosecute Simuro for both lewd and lascivious conduct and sexual assault of K.S.  Consequently, she submits that Simuro's claims must fail as a matter of law.  In addition, Shedd maintains that Simuro was not subject to a custodial arrest; that his criminal suits did not terminate in his favor; and that the state's attorney independently decided to prosecute Simuro.  The Court will address each of those arguments in turn.

### 1. Whether Probable Cause Existed to Arrest and Charge Simuro

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation omitted); *see also Kent v. Katz*, 327 F. Supp. 2d 302, 306 (D. Vt. 2004), aff'd, 125 F. App'x 334 (2d Cir. 2005) (ruling that both a federal and a state claim for false arrest "must fail if there was probable cause for the arrest").  "Given that a lack of probable cause is a necessary element for malicious prosecution," the existence of probable cause is a complete defense to a claim of malicious prosecution as well.  *Lay v. Pettengill*, 38 A.3d 1139, 1151 (Vt. 2011).

Under both state and federal law, "[p]robable cause exists when the facts and circumstances known to an officer are sufficient to lead a reasonable person to believe that a crime was committed and that the suspect committed it." *State v. Chicoine*, 928 A.2d 484, 487 (Vt. 2007); *see also Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

> Accordingly, a court considering a summary judgment motion in a false-arrest or malicious-prosecution case must construe in favor of the non-moving party any factual disputes regarding what circumstances were known to the officer at the relevant time.  After that, however, the court must undertake a neutral, legal analysis of whether those (assumed) circumstances satisfy the probable cause standard.  In other words, the court should resolve in favor of the non-moving party any disputes about what information the officer knew, but it should *neutrally* determine whether that information gave rise to probable cause.  An objectively reasonable police officer applying the probable-cause standard would not automatically or necessarily construe all available information in favor of a particular individual, and neither should the court.

*Benn v. Kissane*, 510 F. App'x 34, 37 (2d Cir. 2013) (internal citation omitted).

Moreover, "under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).  Because "the right to be free

from arrest without probable cause" was "clearly established" at
the time of Simuro's arrest, Shedd is entitled to summary
judgment if her "probable cause determination was objectively
reasonable." *Id.* "An officer's determination is objectively
reasonable if there was 'arguable' probable cause at the time of
arrest," *id.*, which "exists if either (a) it was objectively
reasonable for the officer to believe that probable cause
existed, or (b) officers of reasonable competence could disagree
on whether the probable cause test was met," *Zalaski v. City of
Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotation
omitted).  The same standard for qualified immunity exists under
Vermont state law.  *See Stevens v. Stearns*, 833 A.2d 835, 840
(Vt. 2003).

Here, with respect to his alleged abuse of K.S., Simuro was
arrested for and charged with lewd and lascivious conduct in
violation of 13 V.S.A. § 2602 and sex assault on a minor in
violation of 13 V.S.A. § 3252(d).  Under § 2602(a)(1), the law
prohibits individuals from "willfully and lewdly commit[ting]
any lewd or lascivious act upon or with the body, or any part or
member thereof, of a child under the age of 16 years, with the
intent of arousing, appealing to, or gratifying the lust,
passions, or sexual desires of such person or of such child."
"The determination of whether an act is 'lewd' under § 2602
depends on the nature and quality of the contact, judged by

community standards of morality and decency in light of all the surrounding circumstances, accompanied by the requisite, specific lewd intent on the part of the defendant." *State v. Squiers*, 896 A.2d 80, 85 (Vt. 2006). Section 3252(d) prohibits individuals from engaging "in a sexual act with a child who is under the age of 18 and is entrusted to the actor's care by authority of law or is the actor's child, grandchild, foster child, adopted child, or stepchild."

Construing the facts in favor of Simuro, as the Court must on summary judgment, Shedd was aware of the following circumstances when she arrested Simuro on the charges at issue. On October 19, 2010, Shedd received a report from DCF social worker Erin Keefe indicating that Debra was concerned about K.S. living with Simuro. The report stated that K.S. had a black eye at some point in the past, and that Debra showed Keefe a video recording in which K.S. told Debra "grandpa puts his penis in my butt." ECF No. 155-67 at 2. The report also provided that Debra claimed that Simuro had repeatedly sexually abused her throughout her childhood.

After viewing the report, Shedd arranged to interview K.S. Shedd first watched on a closed-circuit video as K.S. spoke with Keefe. K.S. told Keefe that he felt safe at home with Simuro and that no one had touched him anywhere that made him feel unsafe. K.S. also indicated that Simuro did not give him any

bad touches other than "a spank . . . when [he's] bad." ECF No. 155-20 at 12. Shedd then interviewed K.S. herself. During the conversation, K.S. again expressed that he felt safe at home, and he replied negatively to the question of whether anyone ever touched him in the "area where the bathing suit covers." ECF No. 155-21 at 2. Then, when given a stuffed animal and asked to demonstrate how people touch him, K.S. stated, "Boing . . . like Grandpa . . . unpants my pants, then he goes 'psst,'" while making a slapping motion against the animal's rear. ECF No. 155-21 at 6. In response to Shedd's follow-up questions, K.S. clarified that Simuro pokes his thumb "on the bum" and not *in* the bum, and "on top" of his clothes and not *under* his clothes. ECF No. 155-21 at 6-7. When asked whether "anything ever go[es] in [his] bum," K.S. twice replied "never." ECF No. 155-21 at 7.

Later that day, Shedd spoke with Simuro at the Windsor Police Department. During their conversation, Simuro repeatedly denied that he had ever touched K.S. in an inappropriate manner. Simuro acknowledged that he used his hands to bathe K.S., and he recognized that "it might be a little strange" that he typically washed K.S. in the evenings despite the fact that K.S. frequently wet the bed. ECF No. 155-23 at 11. Simuro proceeded to state, however, that with respect to bathing K.S., he had "never thought of it as sexual." ECF No. 155-23 at 20. At the

conclusion of the interrogation, Shedd arrested Simuro for lewd and lascivious conduct and sexual assault on K.S.

In the Second Circuit, "[i]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). Here, Shedd's determination of probable cause was based solely on K.S.'s statements--those that Keefe, albeit inaccurately, included in her DCF report, and those that K.S. made in his interview with Shedd. There was no physical evidence of sexual abuse, there were no other witnesses, and Shedd did not conduct any additional interviews with K.S.'s doctors, therapists, teachers, or family members.[11]  Because there were several circumstances that raised doubt as to K.S.'s veracity, the Court finds that K.S.'s statements alone were insufficient to establish probable cause as a matter of law.

First, K.S. was five years old at the time of the bathtub video and seven years old when he spoke with Shedd.  As many courts have recognized, police officers must exercise extreme

---

[11] Shedd's probable cause affidavit states that Debra told Shedd on the telephone that K.S. told her that "grampa puts his penis in my butt."  ECF No. 160-14 at 4.  Simuro disputes that Shedd spoke with Debra prior to his arrest, however, based on Keefe's statement that she does not recall Shedd making such a call.  At the summary judgment stage, the Court must resolve this ambiguity in favor of Simuro.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

caution in crediting the statements of young children.  *See, e.g.*, *United States v. Shaw*, 464 F.3d 615, 624 (6th Cir. 2006) (holding that a young child's uncorroborated hearsay allegations were too unreliable to form the basis for probable cause); *Stoot v. City of Everett*, 582 F.3d 910, 920 (9th Cir. 2009) ("In cases involving very young child victims, the courts have repeatedly emphasized the need for some evidence in addition to the statements of the victim to corroborate the allegations and establish probable cause"); *see also* Diana Younts, *Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions*, 41 Duke L.J. 691, 697 (1991) ("[S]tudies examining children's suggestibility have found children to be prone to conforming their stories to the beliefs of the questioning adult.").  In fact, as the Sixth Circuit recently acknowledged, "it appears that no federal court of appeals has ever found probable cause based on a child's allegations absent some other evidence to corroborate the child's story." *Wesley v. Campbell*, 779 F.3d 421, 430 (6th Cir. 2015).

Second, K.S. was medicated for ADHD, and the video recording of his conversations with Keefe and Shedd makes clear that he had difficulties concentrating on the topic of discussion.  Shedd recognized as much in her probable cause affidavit, writing that "KS is all over the room and appears to have a short attention span as he goes from playing with the

31

toys in the room to drawing, to the window watching the construction crews outside."  ECF No. 160-14 at 1.

Third, K.S. made inconsistent statements regarding Simuro's abuse.  It is now clear that K.S. did not state in the bathtub video that "granpa puts his penis in my butt."  *Compare* ECF No. 155-67 at 2, *with* ECF No. 155-15, Video #1.  Nonetheless, Keefe had written that statement in her report, and it was reasonable for Shedd to rely on it during her investigation.  Even assuming that Shedd attributed that statement to K.S., however, K.S. made a number of contradictory remarks in his interviews with both Keefe and Shedd.  K.S. indicated to Keefe that no one touched him anywhere that made him feel unsafe, and that Simuro did not give him any bad touches other than spanks.  Further, after completing his demonstration with the stuffed animal in front of Shedd, K.S. stated that Simuro touched him "on top" of his clothes and not under the clothes, and "on the bum" and not *in* the bum.  ECF No. 155-21 at 6-7.  K.S. made clear that nothing ever went *in* his bum.

When taken together, those circumstances cast significant doubt on the veracity of K.S.'s statements.  Accordingly, a reasonable jury could find that such statements, without further investigation and corroboration,[12] provided an insufficient basis

---

[12] Shedd claims that Debra's allegation that Simuro had sexually assaulted her throughout her childhood, which was present in Keefe's DCF report, serves to corroborate K.S.'s purported statements.  Given that Shedd had previously

for Shedd to reasonably believe that Simuro had committed the crimes of lewd and lascivious conduct[13] and sexual assault on a child.  *See Stoot*, 582 F.3d at 920 (holding that a child's statements alone were not sufficiently reliable to establish probable cause).  The Court, therefore, cannot find that probable cause existed as a matter of law.

In her motion, Shedd urges that she is entitled to summary judgment simply because the state criminal court in which Simuro's cases were filed found that probable cause existed for Simuro's prosecutions.  Yet while "[t]he mere fact that a criminal tribunal found probable cause normally provides a presumption that probable cause existed," that presumption "is rebuttable . . . if a plaintiff can demonstrate that the earlier finding of probable cause was based on misleading, fabricated, or otherwise improper evidence."  *Lay v. Pettengill*, 38 A.3d 1139, 1147 (Vt. 2011).  In other words, a litigant may successfully challenge a trial court's probable cause determination by presenting "a plausible suggestion that the finding of probable cause would not have been reached were it not for some irregularity or impropriety."  *Id.*

---

investigated false accusations made by Debra, however, that fact does not adequately verify K.S.'s statements so as to establish probable cause as a matter of law.  Nor does the fact, also cited by Shedd, that Simuro bathed K.S. at night despite K.S.'s tendency to wet the bed.

[13] The Court recognizes Shedd's argument that Simuro indicated that he helped K.S. bathe by washing K.S.'s body with soap.  Given the unreliability of K.S.'s statements, however, a reasonable jury could find that there was insufficient evidence that Simuro possessed the requisite lewd intent.

In the present case, the undisputed facts reveal that Shedd's arrest warrant contained several misstatements and omissions that were material to the finding of probable cause. First, when describing K.S.'s demonstration with the stuffed animal, Shedd misquotes K.S. as stating "'grampa pulls my pants down'" and "'grampa pokes me in the butt with his thumb.'" ECF No. 160-14 at 2. Second, Shedd inaccurately describes K.S.'s comments by writing that he "is very clear that Simuro pulls his pants down often and then pokes him in the butt as he demonstrates on the stuffed animal." ECF No. 160-14 at 2. Third, Shedd makes no mention that, in response to her questions, K.S. proceeded to clarify that Simuro touched him *on top of* the clothes and *on* the butt, not *under* the clothes or *in* the butt. She also does not write that K.S. twice replied "never" to her question of whether anything ever goes in his butt. Finally, Shedd omits K.S.'s indication that he felt safe with Simuro and that no one ever touched him in anywhere that made him feel unsafe.

Based on the misstatements and omissions in Shedd's affidavit, a reasonable jury could find that Shedd fabricated evidence and misled the trial court in its probable cause determination. Accordingly, Plaintiffs have successfully overcome the presumption expressed in *Lay*, as the undisputed facts suggest that the trial court would not have reached its

finding of probable cause were it not for the inaccuracies of Shedd's affidavit.

Finally, the misstatements and omissions in Shedd's affidavit could also lead a reasonable jury to find that Shedd lacked even arguable probable cause, thereby defeating Shedd's argument for qualified immunity.  As stated above, with all inferences drawn in favor of Simuro, the undisputed facts could allow a factfinder to conclude that Shedd intentionally omitted, fabricated, and mischaracterized evidence in her probable cause affidavit.  The Court has little trouble finding that such action, if true, is not "objectively reasonable." *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).  Moreover, viewed in the light most favorable to Simuro, the circumstances raising doubt as to K.S.'s veracity would prevent officers of reasonable competence from disagreeing as to whether probable cause existed.  *See Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013).  For those reasons, the Court finds that Shedd is not entitled to qualified immunity at summary judgment. *See Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991) ("Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a

conclusion of probable cause, the shield of qualified immunity
is lost.").

### 2. Whether Simuro was Confined

Shedd next argues that even if arguable probable cause did
not exist, she remains entitled to summary judgment on Simuro's
claims of false arrest because Simuro was not subjected to a
custodial arrest on the charges related to K.S.

It is well-established that an individual is seized within
the meaning of the Fourth Amendment "if, in view of all of the
circumstances surrounding the incident, a reasonable person
would have believed that he was not free to leave." *United
States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The Second
Circuit has further explained that "when an officer even briefly
detains an individual and restrains that persons [sic] right to
walk away, he has effected a seizure and the limitations of the
Fourth Amendment become applicable." *Posr v. Doherty*, 944 F.2d
91, 97 (2d Cir. 1991) (internal quotations omitted).  Under
Vermont law, "to constitute an arrest, there must be some real
or pretended legal authority for taking the party into custody;
that he must be restrained of his liberty; that, if he submits,
and is within the power of the officer, it is sufficient without
an actual touching of his person." *Goodell v. Tower*, 58 A. 790,
791 (Vt. 1904).

36

Here, Shedd's argument that her issuance of a citation did not amount to an arrest is belied by her very own affidavit. According to Shedd, at the conclusion of her interview with Simuro, she "advised Simuro that he was being placed under arrest for Sexual assault on KS and no longer free to leave." ECF No. 155-24 at 4.  Such a statement could allow a jury to find that Simuro's liberty was restrained, as it could have undoubtedly caused a reasonable person to believe that, in fact, he was not free to leave.  Accordingly, Shedd has failed to establish that Simuro was not confined as a matter of law.

### 3. Whether Simuro's Criminal Suits Terminated in his Favor

Shedd also contends that Simuro's malicious prosecution claims cannot proceed because Simuro's prosecution on the charges related to K.S. did not terminate in his favor.

In determining whether a prosecution terminated favorably for the purpose of a malicious prosecution claim, both the Second Circuit and the Vermont Supreme Court have adopted the approach of the Restatement (Second) of Torts.  *See Janetka v. Dabe*, 892 F.2d 187, 189-90 (2d Cir. 1989); *Siliski v. Allstate Ins. Co.*, 811 A.2d 148, 151 (Vt. 2002).  Pursuant to that approach, "if the manner of termination, including dismissal, reflects negatively on the merits of the case, it will be considered favorable to the defendant." *Siliski*, 811 A.2d at 151.  By contrast, "if the reason for dismissal is not

37

inconsistent with a defendant's wrongdoing, it will not be considered a favorable termination." *Id.* at 152. "If the circumstances surrounding dismissal are ambiguous on this point, the determination should be left for trial." *Id.; see also Janetka*, 892 F.2d at 189 ("When a termination is indecisive because it does not address the merits of the charge, the facts surrounding the termination must be examined to determine whether the failure to proceed implies a lack of reasonable grounds for the prosecution.").

In the present case, Simuro filed two motions to dismiss the charges of lewd and lascivious conduct and sexual assault of K.S. The first, filed under Vermont Rule of Criminal Procedure 12(d)(1) on June 30, 2011, asserted that the State's evidence failed to establish a prima facie case. ECF No. 155-32. The second, filed pursuant to the United States and Vermont Constitutions and Vermont Rule of Criminal Procedure 7(b) on July 1, 2011, argued that the State's allegations were impermissibly vague. ECF No. 141-15. The State did not oppose either motion, and on August 9, 2011, the trial court granted Simuro's motions in an unwritten decision. ECF No. 155-33.

In her deposition, Deputy State's Attorney Martha Neary asserted a privilege in response to the question of why her office did not oppose Simuro's motions to dismiss. ECF No. 155-18 at 114-115. Neary did provide, however, that Windsor County

State's Attorney Robert Sand had become involved in the case because "there was concern about the state of the evidence in the case and information that was contained in affidavits or documentation." ECF No. 155-18 at 115. Sand himself even drafted a letter to the presiding criminal court judge, indicating that "[t]he State based its charges on the officer's sworn affidavit and the representations contained therein. It is now evident to the State, having reviewed the recordings, that the officer's affidavit is misleading and that the disclosure by KS to the officer did not support the filing of sexual offenses." ECF No. 155-28 at 1.

At the very least, the undisputed facts create an ambiguity as to whether the dismissal of Simuro's charges reflected negatively on the merits of his case. Accordingly, summary judgment is inappropriate, for such a determination must be placed in the hands of a jury.

### 4. Whether the State's Attorney Independently Decided to Prosecute Simuro

Finally, Shedd submits that Simuro's claims of malicious prosecution based on the charges related to K.S. must fail because Deputy State's Attorney Neary exercised independent judgment in deciding to file suit.

"[W]here [an] allegation of misconduct is directed at police, a malicious-prosecution claim cannot stand if the

39

decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by police." *Hartman v. Moore*, 547 U.S. 250, 263 (2006). "In cases against police officers, 'plaintiffs have overcome the presumption that a prosecutor exercises independent judgment in deciding whether to initiate a criminal proceeding where they have shown that the officer either (1) created false information and forwarded it to prosecutors or (2) withheld relevant and material information.'" *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (quoting *Breeden v. City of N.Y.*, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014)).

Here, as discussed previously, Simuro has presented evidence demonstrating that Shedd misstated and omitted material facts in the probable cause affidavit that she submitted to the Windsor Police Department. Deputy State's Attorney Neary then relied on Shedd's affidavit in filing the lewd and lascivious conduct and sexual assault charges against Simuro. ECF No. 155-18 at 173 (indicating that she based Simuro's information on "[t]he affidavit and . . . any other supporting documentation that was provided from [Shedd].") Those facts are sufficient to allow a jury to find that Shedd played an active role in initiating Simuro's prosecution. *See Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997) ("[A] jury could find that [the officer] played a role in initiating the

prosecution by preparing the alleged false confession and forwarding it to prosecutors.”).  As a result, Shedd has failed to show that she is entitled to judgment as a matter of law.

In sum, the Court holds that a jury could find in Simuro's favor on his false arrest and malicious prosecution claims based on the charges related to K.S.  Accordingly, the Court **denies** Shedd's motion for summary judgment with respect to Counts I, VII, and VIII.

### C. Simuro's False Arrest and Malicious Prosecution Claims Based on his Alleged Sexual Assault on Debra and Violation of Conditions of Release

Shedd next moves for summary judgment on Simuro's false arrest and malicious prosecution claims based on his alleged sexual assault on Debra and violation of conditions of release. Shedd again asserts that Simuro's claims fail as a matter of law because there was probable cause for his arrest and prosecution.

As explained above, “[p]robable cause exists when the facts and circumstances known to an officer are sufficient to lead a reasonable person to believe that a crime was committed and that the suspect committed it.” *State v. Chicoine*, 928 A.2d 484, 487 (Vt. 2007); *see also Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).  In the Second Circuit, “a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the

person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

In the instant action, as Simuro argues, several circumstances may have led a reasonable police officer to doubt the veracity of Debra's allegations.  First, Debra had previously made claims that Simuro had physically and sexually abused her throughout her childhood, which she recanted when questioned by an officer from the Windsor Police Department. ECF No. 155-5.  Second, Debra had recently engaged in a dispute with Simuro regarding her living arrangement, and she expressed her frustration with her father during her interview with Shedd. ECF No. 155-6 at 18 ("He's living his perfectly happy life.  He still has his family.  I'm sure he's seeing [K.S.]--talking to his son--whatever.  And I have nothing.  I'm living in a hotel. No money and I can't even see my kid . . . it's not fair."); *see also Mistretta v. Prokesch*, 5 F Supp. 2d 128, 133 (E.D.N.Y.) ("The most common situation in which such doubts arise [about a victim's veracity] is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation.  When such a relationship exists, and is known to the arresting officer before the arrest is made, the complaint alone may not constitute probable cause; the officer may need to investigate further.").  Third, Shedd had spoken with Steven, Debra's brother who grew up in the family home and

42

lived periodically as an adult with Debra and Simuro, and Steven indicated that Debra's claims were unreliable.  ECF No. 160-20 at 79; ECF No. 160-51 at 78.

At the same time, however, there are several reasons as to why a reasonable police officer may have decided to credit Debra's accusations.  To begin, Shedd spoke with Benjamin Harper, an ex-boyfriend of Debra, who informed her that Debra had repeatedly told him that her father was sexually abusing her.  Although Benjamin indicated that he initially doubted the truth of Debra's claims, he also noted that he had seen bruises on Debra that she attributed to Simuro.  Moreover, Shedd spoke with Dawn Harper, Benjamin's mother, and Nicole Boucher, an employee at Valley Vista.  Both Dawn and Boucher also stated that Debra had disclosed her father's abuse in the past. Finally, while a reasonable officer could interpret the tension between Debra and Simuro as a motive for Debra to make a false accusation, it is similarly conceivable that Debra's bitterness arose from years of sexual abuse.  *See Tabor v. New York City*, 2013 WL 4775608, at *5 (E.D.N.Y. Sept. 6, 2013) (recognizing that the complaining witness's "admitted dislike of [the alleged perpetrator] may have been the understandable result of unwanted sexual advances.").

On balance, given the circumstances casting doubt on Debra's veracity, the Court cannot conclude as a matter of law

that probable cause existed to arrest and prosecute Simuro for sexual assault on Debra.  Nonetheless, there are sufficient facts that weigh in favor of accepting Debra's account such that reasonable officers could disagree as to whether Debra was credible.  As provided previously, "[e]ven where a reviewing court . . . concludes that probable cause to arrest was lacking in a given case, an officer will still be entitled to qualified immunity if he can establish that there was arguable probable cause to arrest.  Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotations omitted).  Here, because there was arguable probable cause to arrest and prosecute Simuro for sexual assault on Debra, Shedd is shielded from liability by the doctrine of qualified immunity.[14]  Accordingly, the Court **grants** Shedd's motion for summary judgment with respect to Counts II, X, and XI.

---

[14] Based on the statements of multiple witnesses indicating that they had seen Simuro outside of Windsor County, as well as Simuro's own admission, the Court similarly finds that, at the very least, there was arguable probable cause to support Simuro's arrest and prosecution for a violation of his conditions of release.  *See* ECF No. 160-29.

### D. Plaintiffs' Familial Association Claims and K.S.'s Unlawful Seizure Claim

Shedd also moves for summary judgment on Plaintiffs' familial association claims and the unlawful seizure claim brought on behalf of K.S.  In the amended complaint, Simuro and Simuro on behalf of K.S. bring claims pursuant to 42 U.S.C. § 1983 alleging that Shedd "negligently, intentionally and recklessly" deprived Plaintiffs of their liberty interests in remaining with their family "without coercive government interference in violation of the Fourteenth Amendment of the Constitution of the United States."  ECF No. 74 at 24, 27. Simuro on behalf of K.S. also asserts a § 1983 claim in which he submits that Shedd "negligently, recklessly, intentionally, and in bad faith deprived . . . K.S. of his right to be free of unreasonable searches and seizures, as secured by the Fourth and Fourteenth amendments, by causing the seizure of plaintiff K.S., and thereafter causing plaintiff K.S. to be held in DCF custody despite the lack of probable cause or a reasonable basis."  ECF No. 74 at 26.  Shedd now argues that such claims cannot succeed as a matter of law, as the separation of Simuro and K.S. involved independent decisions by DCF and the family court.

### 1. K.S.'s Familial Association Claim

As an initial matter, Simuro's familial association claim brought on behalf of K.S. is not properly pleaded as a

substantive due process claim.  "Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Southerland v. City of New York*, 680 F.3d 127, 142-43 (2d Cir. 2011) (internal quotation omitted).  "For child removal claims brought by the child . . . the Constitution provides an alternative, more specific source of protection than substantive due process. When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes.  The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'" *Id.* at 143.  Because K.S.'s claim is cognizable under the Fourth Amendment, he cannot assert an additional substantive due process claim. Accordingly, the Court **grants** Shedd's motion for summary judgment with respect to Count VI of the amended complaint.

### 2. Simuro's Familial Association Claim

The Court next addresses the familial association claim brought by Simuro himself.  To establish a violation of a substantive due process right, a plaintiff must demonstrate (1) a protected interest; and (2) state interference with that interest that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at

151.  The Supreme Court has long held that parents and guardians of minor children have protected interests in the care, control, and custody of those children.  *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000).

Because "protective services caseworkers [must] choose between difficult alternatives in the context of suspected abuse," *van Emrik v. Chemung Cnty. Dept. of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990), the Second Circuit has recognized the need for "unusual deference in the abuse investigation context," *Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000) (internal quotation omitted).  Accordingly, an investigation passes constitutional muster as long as a caseworker has a "reasonable basis for [her] findings of abuse."  *Id.* (internal quotation omitted).  Nonetheless, a caseworker may not substantiate a claim of abuse "by ignoring overwhelming exculpatory information or by manufacturing false evidence." *Wilkerson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999).

Here, as discussed above, a reasonable jury could conclude that Shedd both ignored significant exculpatory evidence and manufactured false evidence when preparing her probable cause affidavit.  Shedd's affidavit was then attached to and incorporated into Keefe's affidavit, ECF No. 155-72 at 3, which provided the factual basis for the CHINS petition that the State submitted to family court, ECF No. 155-72.  The family court

47

proceeded to rely on the affidavits of Keefe and Shedd in granting the State's request to transfer temporary legal custody of K.S. to DCF, specifically noting its concern with the "allegations [of] sexual abuse of [K.S.]." ECF No. 155-84.

Contrary to Shedd's argument, the family court's approval of the State's petition does not insulate Shedd from liability. The Second Circuit has held that once "court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." *Southerland*, 680 F.3d at 153 (internal quotation omitted). Yet, as at least one other court has recognized, "when the facts upon which the judicial tribunal relies are themselves false or misleading, court confirmation will not suffice to show that the caseworker's conduct had an objectively reasonable basis." *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 374 (E.D.N.Y. 2011) (internal quotation omitted). Here, both the CHINS petition and the family court's temporary custody order relied on Shedd's affidavit. Thus, because a reasonable jury could find that the misstatements and omissions in Shedd's affidavit were sufficiently egregious so as to shock the temporary conscience, Shedd cannot prevail as a matter of law.[15]

---

[15] Although Shedd does not address qualified immunity, the Court notes that she is not entitled to such a defense on summary judgment, as a reasonable jury could find that her misstatements and omissions were not "objectively

The Court therefore **denies** Shedd's motion for summary judgment with respect to Count III of the amended complaint.

### 3. K.S.'s Unlawful Seizure Claim

As stated previously, "[w]hen a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes.  The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'" *Southerland*, 680 F.3d at 143.

For the purposes of the Fourth Amendment, the removal of a child from his parents' or guardians' custody is generally considered to be reasonable when it is executed pursuant to a court order.  *See Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011).  "However, when caseworkers, in their petition for removal, make intentionally or recklessly false statements that are necessary to a court's finding of probable cause, they are subject to Fourth Amendment liability." *Estiverne*, 833 F. Supp. 2d at 379; *see also Southerland*, 680 F.3d at 148-49 (denying summary judgment for an allegedly illegal search based on a removal petition, where there were issues of material fact as to whether the caseworker "knowingly or recklessly made false statements in his affidavit" and as to whether "such false statements were necessary to the court's finding of probable cause"); *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007)

---

reasonable." *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).

(internal citation omitted) (holding that "[a] seizure conducted pursuant to a warrant obtained by judicial deception violates the Fourth Amendment.").

In the present case, Plaintiffs have presented sufficient evidence to allow a reasonable jury to find that Shedd intentionally omitted and misstated facts in her probable cause affidavit.  Because the affidavit was incorporated into the State's CHINS petition, and because the temporary custody order specifically mentioned the allegations of sexual assault as one of the bases for removal, the Court cannot find, as a matter of law, that Shedd's affidavit was not material to the family court's decision to seize K.S.[16]  *See Estiverne*, 833 F. Supp. 2d at 379 (denying summary judgment on a child's Fourth Amendment seizure claim due to a "genuine issue of material fact as to whether the petition for removal was either intentionally or recklessly false.").  For those reasons, the Court **denies** Shedd's motion for summary judgment with respect to Count V of the amended complaint.

### E. Simuro's Claim for Intentional Infliction of Emotional Distress

Finally, Shedd moves for summary judgment on Simuro's claim of intentional infliction of emotional distress.  In support of

---

[16] Again, although Shedd does not raise the issue, the Court notes that she is not entitled to qualified immunity because a reasonable jury could find that her misstatements and omissions were not "objectively reasonable."  *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).

her position, she asserts that her behavior was not sufficiently outrageous to satisfy the elements of such a claim.

"To avoid summary judgment on a claim for [intentional infliction of emotional distress], [P]laintiff must show that [Defendant] 'engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Cate v. City of Burlington*, 79 A.3d 854, 862–63 (Vt. 2013) (quoting *Fromson v. State*, 848 A.2d 344, 347 (Vt. 2004)). "The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). "It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets this test." *Jobin v. McQuillen*, 609 A.2d 990, 993 (Vt. 1992).

As discussed previously, a reasonable jury could find that Shedd intentionally omitted and misstated facts in her probable cause affidavit that inculpated Simuro on the charges related to K.S. She then submitted her affidavit to the State's Attorney's Office, which relied on her statements in its decision to prosecute Simuro for lewd and lascivious conduct and sexual

assault on a minor.  As a result, Simuro was separated from his grandson for more than a year.  He also faced significant jail sentences and a lifetime of social stigma.  Viewing the facts in the light most favorable to Simuro, it cannot be said as a matter of law that Shedd's conduct was not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community." *Farnum*, 671 A.2d at 1256.  Such a determination must be made by a jury.  Accordingly, the Court **denies** Shedd's motion for summary judgment with respect to Count XIII of the amended complaint.

## CONCLUSION

As explained above, the Court **grants** the Town of Windsor's motion for judgment on the pleadings (ECF No. 122).  The Town of Windsor is therefore dismissed from this case, and the Court **denies** its motion for summary judgment (ECF No. 142) as moot. Defendant Shedd's motion for summary judgment (ECF No. 141) is **granted in part and denied in part.**  The Court **grants** summary judgment on Counts II, VI, X, and XI, and **denies** summary judgment on Counts I, III, V, VII, VIII, and XIII.  Finally, Counts IV and XIV are **dismissed**, as the defendants against whom those claims were brought have been dismissed from this suit. Counts IX and XII are also **dismissed,** as they were brought against only the Town of Windsor.

52

Dated at Burlington, in the District of Vermont, this 31st day of March, 2016.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
