UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ERNEST SIMURO, and ERNEST SIMURO      :
On behalf of K.S., a minor,           :
                                      :
          Plaintiffs,                 :
                                      :
          v.                          :    Case No. 2:13-cv-00030
                                      :
LINDA SHEDD,                          :
                                      :
          Defendant.                  :

## OPINION AND ORDER

Plaintiffs Ernest Simuro ("Simuro") and Simuro on behalf of his grandson, K.S., brought the present action against Defendant Linda Shedd ("Shedd"), other government officials and the Town of Windsor. In their amended complaint, Plaintiffs asserted a number of federal constitutional claims and torts claims under Vermont state law related to Ernest Simuro's arrest and prosecution for his alleged sexual abuse of his grandson, and for K.S.' subsequent placement into the custody of the Vermont Department of Children and Families ("DCF").

### Factual Background

Simuro is currently the adoptive parent of his biological grandson, K.S., who was born in 2003. In K.S.'s early childhood years, Simuro was appointed to be K.S.'s legal guardian because his daughter, Debra Simuro ("Debra") was unable to care for her

child due to an addiction problem. In 2007, Debra became a co-guardian of K.S. with Simuro, and at various points lived in Simuro's home with her son and her partner. According to Simuro, he eventually asked his daughter and her partner to leave the house because he suspected that his daughter and her partner were repeatedly stealing K.S.'s medication.

K.S. is a special-needs child with significant developmental and emotional challenges, and has received medication for Attention Deficit Hyperactivity Disorder from a young age. His therapist, Dr. Patricia Corrigan, testified that K.S. had apparent relational issues and significant anxiety, which she attributed to his mother's repeated abandonment of K.S., his grandmother's death and other family stressors. K.S. had difficulty cooperating with other children and demonstrated aggressive behavior towards them at times. According to Dr. Corrigan, there were also reports from K.S.'s school of his sexualized behavior. For example, at one point, K.S. talked about having "cocks or penises" for breakfast, masturbated publicly in school, and made drawings depicting his mother and grandfather naked, with representations of their genitalia. She reported these incidents to DCF, and expected that another person would investigate any potential sexual abuse. However, she also testified that these behaviors could be a form of

2

anxiety relief, and that she did not see themes of sexual abuse in K.S.'s play therapy. She testified that there were reports of K.S. wetting his bed every night, another potential, but not decisive, sign of abuse. She described Simuro as an active, positive figure in K.S.'s life, who often advocated for K.S. to receive additional support services at school. Dr. Corrigan also provided supportive counseling to Simuro while she served as K.S.'s therapist.

In late 2010, when K.S. was seven years old, Debra informed a DCF worker, Erin Keefe ("Keefe"), that K.S. had reported to her that his grandfather "stuck his penis in his butt." She showed Keefe a video in which she filmed K.S. taking a bath. In the video, Debra prompts K.S. to repeat what he allegedly had told her before she began filming the video. K.S., giggling, eventually responds "yeah" to his mother's question of whether "grandpa" puts his penis in K.S.'s butt. The video was over a year old by the time Debra disclosed it to Keefe. Debra also told Keefe that, as she had asserted to the authorities before, Simuro had sexually abused her as a teenager. Keefe did not obtain a copy of the video during that visit with Debra.

After speaking with Debra, Keefe called the Windsor Police Department and later received a return call from then-sergeant Linda Shedd ("Shedd"), who was the designated officer at the

Department for sexual abuse investigations. Keefe testified that she informed Shedd of the nature of the investigation, and that she believes that her conversation with Shedd on that occasion was brief. Shedd asked Keefe to meet with her at the Child Advocacy Center, where she would interview K.S. Keefe testified that she went to Simuro's home and spoke to Simuro, informing him of the situation and notifying him that she was not allowed to transport K.S. to the interview. Dr. Corrigan eventually took K.S. to the CAC.

Both Keefe and Shedd then interviewed K.S. at the CAC. Plaintiffs' expert, Dr. Phillip Kinsley, testified about his professional evaluation of Shedd and Keefe's forensic interview techniques after reviewing video footage of the CAC interviews. He characterized Keefe's interview as "not bad," stating that she established good rapport with K.S., that she allowed the child to talk openly and that she asked open-ended question. He concluded that K.S. did not make any disclosures of sexual abuse during this interview. Dr. Kinsley was much more critical of Shedd's subsequent interview, however. First, he testified that he did not believe that, given the lack of disclosures produced in Keefe's interviews, it was necessary for Shedd to do a second interview at all. He also opined that Shedd violated all of the forensic interview "rules" to ensure reliability over the course

of her interview. According to Dr. Kinsley, Shedd exhibited
confirmatory bias, inappropriately introduced herself as an
authority figure, did not accept the child's "denials," and
cornered and "funneled" the child with leading questions. At one
point, Shedd asked K.S. to show her how people touch him on a
mother goose doll. K.S. looked under the doll's clothing, and
said, "'boing'. . . like Grandpa . . . unpants my pants, then he
goes 'pssst'." The child then touched the doll on the rear with
his thumb. After further questioning by Shedd, the child stated
that the touching occurs over the clothes and on his bum, not
under the clothes or in his bum.

Shedd then interviewed Simuro directly. During this
interview, Simuro reported that he washed the child with his
hands and that he typically bathed him at night rather than in
the morning, despite K.S.'s tendency to wet the bed. In the
middle of this interview, Shedd called the State's Attorney's
office to request guidance on how to proceed with the case. She
also alleged that she called Debra Simuro at this time. After
making these calls, Shedd placed Simuro under arrest and issued
a flash citation for him to appear in court the next day. Shedd
and Keefe then accompanied Simuro to his house in order to
permit him to pack some belongings. At this time, they
interacted with Steven Simuro ("Steven"), Simuro's son and

Debra's brother, who stated that he did not believe that Simuro
had abused K.S. and that he believed that Debra was a liar.

Shedd drafted an affidavit outlining her version of the
evidence against Simuro and faxed it to the State's Attorneys'
office that night. The State's Attorney pursued charges against
Simuro based on the facts included in the affidavit, and the
charges were eventually dismissed after the State failed to
oppose Simuro's motion to dismiss. In addition, the State
brought a case against Simuro in family court pursuant to a
Child in Need of Care or Supervision ("CHINS") petition. Steven
was permitted to care for the child temporarily immediately
following Simuro's arrest, but K.S. was later placed in foster
care for several months due to Steven's alleged interference
with Debra's relationship with K.S. Steven eventually became a
foster parent himself, allowing him to care for K.S. once again
until the criminal and family court proceedings against Simuro
came to an end.

## Procedural Background

On September 4, 2015, this Court granted Plaintiffs' motion
to dismiss all claims against Defendants Erin Keefe and Janet
Melke, social workers employed by DCF. The Court also granted
the Town of Windsor's motion for judgment on the pleadings and
dismissed the Town of Windsor from the case on April 1, 2016. On

that same date, this Court granted in part and denied in part
Defendant Shedd's motion for summary judgment. Finally, on
November 7, 2016, the Court denied Defendant Shedd's motion for
judgment on the pleadings. As a consequence, the only claims
remaining for trial were Simuro's claims against Defendant Shedd
for false arrest and malicious prosecution under federal and
state law, for interference with his constitutional right to
familial association, and for intentional infliction of
emotional distress, along with K.S.' claim against Defendant
Shedd for unlawful seizure.

The Court held a jury trial on these remaining claims between
November 9 and 21, 2016.  On November 21, the jury issued a
general verdict in favor of Simuro on his federal and state
malicious prosecution claims (Counts I and VIII), but against
the Plaintiffs on all other counts. It awarded Simuro $100,000
in compensatory damages and $200,000 in punitive damages. In
addition, the verdict form included a special interrogatory that
stated:

> If you found in favor of either Plaintiff on any of the
> above counts, please answer the following questions:
> A. Do you find that it was objectively reasonable for
>    Defendant Shedd to believe that probable cause existed?
> B. Do you believe that officers of reasonable competence
>    could disagree on whether Defendant Shedd had probable
>    cause to arrest Plaintiff Ernest Simuro?

The jury answered both questions in the affirmative. After
reading the verdict form, the Court noted that the jury's

response to the special interrogatory could potentially conflict with the jury's general verdict, and requested that the parties address the potential inconsistency in their post-trial motions. In response, Simuro and Shedd filed cross motions for entry of judgment. Shedd asserts that the special interrogatory is consistent with the jury's general verdict, but requires the Court to grant her qualified immunity on both Simuro's false arrest counts and his malicious prosecution counts. She also contends that the evidence adduced at trial failed to establish the elements of the malicious prosecution counts. Simuro argues that the jury's verdict on malicious prosecution should be honored because the trial record provides a legally sufficient evidentiary basis for a reasonable jury to find for him on those claims. In addition, he requests that the Court enter judgment in his favor on the malicious prosecution counts because the jury's responses to the special interrogatories do not require the Court to grant Shedd qualified immunity on the malicious prosecution claims. Finally, Simuro has submitted a "placeholder" motion for attorneys' fees to preserve his ability to file a full motion after the Court decides the substantive motions for entry of judgment. Both parties recognize that the motion is not ripe yet.

Separately, Plaintiff K.S. filed a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure,

arguing that the Court's instructions to the jury were erroneous because they precluded a finding of liability on K.S.' sole claim of unlawful seizure on the basis of one theory previously upheld by the Court. Shedd asserts that the Court's instruction was not erroneous and that any potential error would be harmless. For the reasons outlined below, the Court denies Defendant Shedd's motions and K.S.'s motion for a new trial, and grants Simuro's motion for entry of judgment on his malicious prosecution counts.

### Discussion

1. *Whether Defendant Shedd is entitled to qualified immunity on Simuro's malicious prosecution counts*

Rule 49 of the Federal Rules of Civil Procedure requires a court to approve, for entry under Rule 58, an appropriate judgment on the basis of a jury's verdict and answers to special interrogatories where these two sets of responses are consistent. Fed. R. Civ. P. 49(b)(2). However, "[w]hen the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may: (A) approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict; (B) direct the jury to further consider its answers and verdict; or (C) order a new trial." Fed. R. Civ. P. 49(b)(3). When faced

with seemingly irreconcilable answers from the jury, courts must "harmonize the jury's several pronouncements if possible rather than use the answers to special questions as weapons for destroying the general verdict." *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 407 F.2d 521, 526 (2d Cir. 1969). Courts favor reading these responses in a manner that allows the court to uphold the general verdict, so as to protect the parties' Seventh Amendment right to a jury trial. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364 (1962); *Kerman v. City of N.Y.*, 374 F.3d 93, 121 (2d Cir. 2004).[1] Thus, the Defendant here must overcome the Court's inclination to read the answer to the interrogatory in a manner that upholds the jury's finding of liability for malicious prosecution, as this is the purpose behind judicial efforts to reconcile verdicts with special interrogatories.

---

[1] Shedd asserts that special interrogatories can be read as "consistent" with the general verdict while maintaining, at the same time, that the responses to the special interrogatories require the Court to overturn the jury's finding of liability. In support of this view of the consistency standard, Shedd points to a single district court decision overturning a general verdict based on the answer to a special interrogatory, where the Court reasoned that the jury instructions and the question addressed separate matters, and the charge was insufficient to allow the jury to reach the correct general verdict. *See e.g., U.S. v. Lucarelli,* 490 F.Supp. 2d 295, 300 (D. Conn. 2007) ("the specific intent element instructions for each crime were insufficient, and the jury's special interrogatory answers merely illustrated that fact, rather than presented an inconsistent verdict"). Generally, such a holding would undermine the rationale for the rule of consistency.

Both parties urge the Court to interpret the jury verdict to be "consistent" with the special interrogatory, but in different ways. Defendant asserts that the jury's general verdict does not encompass an analysis of arguable probable cause, because the jury instruction on probable cause for the malicious prosecution count merely cross-referenced the general definition of probable cause. As a result, the jury likely concluded that it should only analyze whether there was arguable probable cause in the context of false arrest.[2] Nevertheless, she also maintains that the jury would have understood the special interrogatories to apply to Shedd's decision to arrest Simuro and to initiate his prosecution. Therefore, she concludes, the special interrogatory may properly be found to apply to the qualified immunity analysis on the malicious prosecution count as well as the false arrest count. Accordingly, she asserts that the answers to the special interrogatories immunize Shedd from the only count for which the jury found her to be liable.

In contrast, Plaintiffs contend that the jury verdict and special interrogatory can be read in a manner which permits the

---

[2] Thus, she claims, the jury's finding that she is liable for malicious prosecution but not for false arrest leads to the conclusion that the jury found Shedd to have arguable, but no actual probable cause for her conduct. In making this argument, Shedd does not distinguish between the set of facts that might have led to a probable cause to arrest analysis and an analysis of probable cause to prosecute.

jury's verdict of liability on malicious prosecution to stand. They first assert that the jury's pronouncements could stand for the conclusion that the jury found Shedd not liable for false arrest on qualified immunity grounds alone, despite concluding that she conducted the arrest without probable cause. However, they do not explain why this possibility would require the Court to uphold the malicious prosecution verdict.[3] Thus, Simuro's first argument lacks logical weight. Second, Simuro also asserts that the jury's answers could be reconciled if interpreted to mean that Shedd had actual and arguable probable cause to arrest, but that she lacked actual and arguable probable cause to prosecute because new information became available between the time that the arrest was conducted and the prosecution was initiated that reversed Shedd's initial probable cause determination. Since he contends that the special interrogatory response need not apply to the arguable probable cause determination for the prosecution, Simuro maintains that the special interrogatory does not require the Court to grant Shedd immunity from malicious prosecution.

---

[3] The rationale behind this argument appears to be that if the arrest was conducted without probable cause, then the prosecution must also have been without probable cause. Nevertheless, Plaintiffs fail to explain why the analogous reasoning between actual probable cause for arrest and prosecution does not carry over to the arguable probable cause context, requiring the Court to apply the jury's finding of arguable probable cause to arrest to the malicious prosecution inquiry.

Although the scope of the special interrogatories is pertinent to the Court's qualified immunity analysis, they are not binding on this Court's legal conclusions on this question. The Second Circuit has noted that

> [w]hether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact. The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, a contention that — notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of — it was objectively reasonable for the official to believe that his acts did not violate those rights has its principal focus on the particular facts of the case.

*Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007). Thus, "[o]nce the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." *Id.* at 368. Special interrogatories are intended to address relevant questions of fact. Fed. R. Civ. P. 49(b)(1) ("The court may submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide."). Accordingly, the Court considers the jury's response insofar as it reflects on the factual determinations relevant to its decision on qualified immunity. If the Court finds that Shedd is entitled to qualified immunity on this claim as a legal

13

matter, it must enter a judgment in favor of Shedd on malicious prosecution, notwithstanding the jury's general verdict to the contrary. *Id.* at 367.

In order to ensure that the jury's responses appropriately inform the Court's legal analysis on qualified immunity, the court must determine whether the arguable probable cause determination made by the jury in response to the interrogatories applies only to Shedd's decision to arrest or to both her arrest and the subsequent prosecution. For the reasons stated below, the Court finds that the jury must have understood the interrogatories to address only Shedd's probable cause to arrest Simuro. The jury's general verdict is also indicative of factual findings: as outlined below, the Court concludes that the jury did not analyze arguable probable cause, or any other legal question pertinent to this Court's qualified immunity analysis, in reaching its finding of liability for malicious prosecution.

Since the jury did not resolve the qualified immunity question in its verdict, the Court next analyzes the implications of these jury findings for its independent assessment of whether Shedd is entitled to qualified immunity on Simuro's malicious prosecution claims. Specifically, the Court considers whether the arguable probable cause standard resolves

14

the qualified immunity inquiry in a case where an officer misrepresents relevant information to the prosecutor, and, if not, whether Shedd is otherwise entitled to qualified immunity.

    a. *The scope of the jury's determinations*

The Second Circuit has distinguished probable cause to arrest from probable cause to prosecute. *See DiMascio v. City of Albany*, 205 F.3d 1322 (2d Cir. 2000) ("Neither the parties nor the district court addressed the probable-cause-to-initiate-a-prosecution issue apart from the probable-cause-to-arrest issue."); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that Posr could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim; the defendants urge only the former."); *Kent v. Katz*, 146 F. Supp. 2d 450, 461 (D. Vt. 2001), *aff'd in part*, 312 F.3d 568 (2d Cir. 2002) ("The Court has already held that factual questions remain as to whether Katz had probable cause to arrest Kent. By the same token, factual issues remain as to whether Katz had probable cause to initiate a prosecution against Kent, which is a slightly different inquiry."). Nevertheless, in the context of determining actual probable cause in a malicious prosecution case, courts connect the two determinations. In

15

particular, courts have held that if there is probable cause to arrest, there must also be probable cause to prosecute, *unless* that determination is later nullified by exonerating information. *See Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449–50 (E.D.N.Y. 2015) ("Probable cause to arrest is a defense to a claim of malicious prosecution if it is not later nullified by information establishing the accused's innocence.") (internal quotation omitted); *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003) ("[T]he probable cause that existed at the time of [plaintiff's] arrest had been nullified by information establishing [plaintiff's] innocence" at the time charges were brought) (cited with approval in *Prive v. Wells*, No. 5: 13-CV-320, 2015 WL 1257524, at *12 (D. Vt. Mar. 17, 2015)). The Court's instruction to the jury was consistent with the reasoning of these decisions, stating: "probable cause to prosecute and probable cause to arrest are distinguishable in that the determination as to each is made in different moments, and may be based on a different set of facts if made at a later point in time." ECF No. 215, pg. 16. Thus, since the jury was instructed that probable cause to prosecute and probable cause to arrest are distinct determinations, a jury finding of arguable probable cause to arrest would not necessarily indicate that it also found arguable probable cause to prosecute.

Here, the special interrogatories stand merely for the

limited proposition that Shedd had arguable probable cause to arrest. [4]  The second interrogatory, which inquired about whether officers of reasonable competence could disagree on whether Shedd had probable cause to arrest, was limited in this manner by its own wording. Although the first question, which asked the jury to determine whether it was objectively reasonable for Defendant Shedd to believe that probable cause existed, did not contain the limiting language, there are three reasons why the jury's response should be applied only to the decision to arrest. First, the pairing of the two questions suggests that the first question applies only to Shedd's decision to arrest Simuro. Second, the Court's instruction to the jury suggested that for purposes of establishing the elements of malicious prosecution, probable cause *to prosecute* must have been lacking. Since Shedd did not in fact prosecute Simuro, but at most caused the initiation of the prosecution, it would be reasonable for

---

[4] To sustain her claim that the special interrogatory must be found to apply to both the false arrest and the malicious prosecution count, Shedd asserts that the interrogatory begins with an invitation to answer the question if the jury finds in favor of the Plaintiffs on any of their claims. Her argument that this introductory phrase must guide this Court's determination of the applicability of the interrogatories to the malicious prosecution counts is not persuasive. According the phrasing of the introduction, the jury would have been required to provide an answer even if it found in favor of either Plaintiff on claims to which qualified immunity clearly does not apply, such as the Plaintiff's claim for intentional infliction of emotional distress. Therefore, the prompt cannot be found to determine which counts the special interrogatory was intended to have legal relevance for.

the jury to determine that the probable cause determination for
malicious prosecution must apply to the prosecutor's decision to
prosecute, rather than to Shedd's decisions or thinking. Both
Sand, the State's Attorney in charge of the office handling
Simuro's prosecution, and Cahill, the prosecutor who spoke to
Shedd immediately after she interviewed Simuro, testified
accordingly, differentiating between officers' and prosecutors'
probable cause determinations. Thus, since the special
interrogatory applies to Shedd's reasoning regarding the
decisions she took herself, the jury likely concluded that the
interrogatory applied only to whether she had probable cause to
arrest Simuro. Third, the charge on arguable probable cause
included in the false arrest section established that Shedd "is
not liable *for the arrest* if either (a) it was objectively
reasonable for the officer to believe that probable cause
existed; or (b) officers of reasonable competence could disagree
on whether the probable cause test was met." ECF No. 215, p. 14
(emphasis added). Given the parallel wording in the special
interrogatories, it would be reasonable for the jury to assume
that the questions pertaining to these two grounds for qualified
immunity applied only to Shedd's liability for her arrest of
Ernest Simuro.

Since the special interrogatories are limited to Shedd's decision to arrest Simuro, such that the jury did not necessarily reach a conclusion about whether the Defendant had arguable probable cause to initiate a prosecution in answering them, the jury's verdict on the malicious prosecution claim could be based on either of two theories that would render the verdict consistent with the interrogatory responses. First, the jury could have understood its verdict on malicious prosecution to include an analysis of arguable probable cause to prosecute. The charge on malicious prosecution instructed the jury that "[t]he same concept of probable cause applicable to the Plaintiff's false arrest claim also applies here," and went on to establish the distinction between probable cause to arrest and to prosecute noted above. The concept of probable cause described in the charge on false arrest included a general definition of probable cause and noted that "two legal doctrines related to probable cause . . . make the Plaintiffs' task of establishing liability more difficult." One of the subsections describing these doctrines outlines the concept of arguable probable cause, noting that "a police officer may be shielded from liability if she had 'arguable probable cause' to conduct an arrest." Thus, although the charge on arguable probable cause is framed in light of the false arrest count, it is included as a subsection modifying the general probable cause analysis,

19

which the malicious prosecution charge cross-references.
Therefore, the jury could have understood the cross reference in
the probable cause to prosecute section to include an analysis
of arguable probable cause to prosecute. Accordingly, its
general verdict would reflect the jury's conclusion that Shedd
lacked both actual and arguable probable cause to prosecute,
even though she had arguable probable cause to arrest.[5]

Alternatively, the jury may have understood the cross-
reference in the malicious prosecution charge to exclude an
analysis of arguable probable cause. In this scenario, the
general verdict stands merely for the notion that there was no
actual probable cause to prosecute, but is not necessarily
indicative of a finding that there was no arguable probable
cause to prosecute. And, as noted above, the jury's finding, by
means of the special interrogatory, that Shedd had arguable
probable cause to arrest is not conclusive on this issue, since
it would be possible for the jury to find that Shedd had

---

[5] Although this conclusion does not exhaust the Court's need to
conduct its own legal analysis regarding whether Shedd would be
entitled to qualified immunity, it is consistent, at least on
its face, with the jury's general verdict finding Shedd to be
liable for malicious prosecution.

arguable probable cause to arrest but not arguable probable
cause to prosecute.[6]

In short, the Court must interpret the general verdict to
stand for the conclusion that there was either no arguable
probable cause to prosecute Simuro or to be silent on the issue
of arguable probable cause to prosecute altogether. It must
interpret the special interrogatories to stand merely for the
notion that Shedd had arguable probable cause to arrest Simuro.
These two sets of conclusions –one stemming from the general
verdict, and one stemming from the special interrogatories –are
instructive to, but in no way predetermine, the Court's
qualified immunity analysis on Simuro's malicious prosecution
claim. *See Zellner*, 494 F.3d at 367–68 ("The ultimate question
of whether it was objectively reasonable for the officer to
believe that his conduct did not violate a clearly established
right, *i.e.,* whether officers of reasonable competence could
disagree as to the lawfulness of such conduct, is to be decided
by the court.").

In addition, in order to find Shedd liable on the malicious
prosecution count and to award Simuro punitive damages, the jury
must have made additional factual findings. For example, they

---

[6] In holding that the jury could have found this to be true, the
Court does not intend to embrace this finding as its own legal
conclusion.

must have found that Shedd acted with malice in causing the
initiation of Simuro's prosecution, that her conduct was
outrageously reprehensible and that her behavior was either
motivated by evil motive or intent or involved reckless or
callous indifference to Simuro's federally protected rights.
These factual findings are as pertinent to the Court's legal
analysis on qualified immunity as the jury's findings regarding
probable cause, which may be inferred from the general verdict
on malicious prosecution and the special interrogatories.

    *b. Qualified immunity analysis*

    "Qualified immunity shields government officials performing
discretionary functions from liability for civil damages insofar
as their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have
known." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007)
(internal quotation omitted).  Thus, a plaintiff must
demonstrate that "(1) the official violated a statutory or
constitutional right, and (2) the right was 'clearly
established' at the time of the challenged conduct" in order to
overcome qualified immunity.  *Turkmen v. Hasty*, 789 F.3d 218,
280-81 (2d Cir. 2015), *cert. granted,* 137 S. Ct. 293, 196 L. Ed.
2d 211 (2016) (internal quotation omitted). "To be clearly
established, a right must be sufficiently clear that every

reasonable official would have understood that what he is doing
violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044
(2015) (internal quotation omitted). In cases alleging
unreasonable searches or seizures, the Supreme Court has
instructed lower courts to define the clearly established right
at issue on the basis of the specific context of the case. *Tolan
v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Thus, "[q]ualified
immunity gives government officials breathing room to make
reasonable but mistaken judgments about open legal questions.
When properly applied, it protects all but the plainly
incompetent or those who knowingly violate the law." *Ashcroft v.
al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d
1149 (2011) (internal quotation omitted).

   Defendant Shedd reasons that applying the "arguable
probable cause" analysis to the context of malicious prosecution
ends the qualified immunity inquiry. However, as then-Circuit
Judge Sotomayor has stated, " reasonableness — and therefore the
existence of "arguable probable cause"— are considerations that
properly fall *within* the clearly established inquiry as the
Supreme Court has described it. It is not surprising, then, that
'arguable probable cause' finds no mention in any Supreme Court
opinion." *Walczyk v. Rio*, 496 F.3d 139, 168 (2d Cir. 2007)
(Sotomayor, J., concurring). Although the Second Circuit has

continued to apply the concept of "arguable probable cause" to
determine whether a Defendant is liable for false arrest, it has
mentioned this concept in the context of malicious prosecution
only in passing. *See, e.g., Zalaski v. City of Hartford*, 723
F.3d 382, 390 (2d Cir. 2013) ("Even where a reviewing court . .
. concludes that probable cause to arrest was lacking in a given
case, an officer will still be entitled to qualified immunity if
he can establish that there was 'arguable probable cause' to
arrest.") (internal quotation marks omitted); *Betts v. Shearman*,
751 F.3d 78, 82–83 (2d Cir. 2014) ("Plaintiff's false arrest,
false imprisonment, and malicious prosecution claims therefore
turn on whether the defendant officers' probable cause
determination was objectively reasonable — that is, whether
there was "arguable" probable cause to arrest."). In other
cases, it has applied a more broadly framed standard — whether
reasonable officers would have believed their actions to be
lawful – in determining whether qualified immunity shields an
officer from liability for malicious prosecution. *See
Manganiello v. City of N.Y.*, 612 F.3d 149, 164–65 (2d Cir. 2010)
(affirming denial of qualified immunity where, "given the jury's
findings that [the defendant officer] misrepresented the
evidence to the prosecutors, or failed to pass on material
information, or made statements that were false, and engaged in
such misconduct knowingly, and given the ample evidentiary

support for those findings, the district court correctly concluded that no reasonable officer could have believed [the defendant's] actions to be lawful."). In light of the Supreme Court's recent reiteration of the standards which guide lower courts' qualified immunity determinations, the Court applies this universal formulation of the qualified immunity standard, rather than limiting its reasoning to determining whether there was arguable probable cause to prosecute Simuro. *See White v. Pauly,* No. 16-67, 2017 WL 69170, at *4 (U.S. Jan. 9, 2017) ("In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. . . Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality") (internal quotations omitted).[7]

The jury's factual determinations that Shedd acted with malice in prompting prosecutors to bring charges against Simuro,

---

[7] This Court's April 1, 2016 Opinion and Order regarding summary judgment addressed Shedd's qualified immunity argument with respect to false arrest and malicious prosecution in the same section, and did not specifically distinguish its reasoning as to each. ECF No. 166, pg. 25-35. The Court applied the arguable probable cause standard, concluding that "the misstatements and omissions in Shedd's affidavit could also lead a reasonable jury to find that Shedd lacked even arguable probable cause, thereby defeating Shedd's argument for qualified immunity." Nevertheless, the Court also held that Shedd's intentional omissions, fabrications and mischaracterization of evidence in her probable cause affidavit, if true, would not be "objectively reasonable."

that her conduct was outrageously reprehensible and that her behavior was either motivated by evil motive or intent or involved reckless or callous indifference to Simuro's federally protected rights lead the Court to conclude, as a legal matter, that no reasonable officer could have believed Shedd's actions to be lawful. In fact, the Second Circuit had previously ruled on a substantially similar claim, finding that an officer was not entitled to qualified immunity on a malicious prosecution claim where the officer misrepresented evidence to the prosecutors or knowingly made statements that were false. *See Manganiello*, 612 F.3d at 164–65. Thus, the Court is not persuaded that a jury finding that "it was objectively reasonable for the officer to believe that probable cause existed," even if applied to the prosecution, necessitates a finding that a reasonable officer would have believed her conduct to be lawful in these circumstances. Rather, these findings suggest that Shedd's conduct was plainly incompetent, and thus not protected by qualified immunity. The jury's findings on the special interrogatories, which the Court finds to be limited to the context of false arrest, do not require a different conclusion.

Even if this Court were to apply the "arguable probable cause" standard for qualified immunity to the Plaintiff's

malicious prosecution claim, however, its conclusions would not differ. In order to determine whether the prosecution of Simuro was conducted with "arguable probable cause," the Court must take into account the information available to prosecutors at the time that they decided to pursue Simuro's case. In contexts, such as this one, where a decision-maker is provided with an inaccurate affidavit as the basis for his or her decision to prosecute, courts in the Second Circuit look to what a "corrected affidavit" would have said to determine whether the inaccuracies are material to the probable cause determination. *See Loria v. Gorman*, 306 F.3d 1271, 1288-89 (2d Cir. 2002)(analyzing whether "the contents of the 'corrected affidavit' would have supported a finding of probable cause" to determine whether qualified immunity was warranted in a case involving claims which "sound in malicious prosecution under state and federal law"); *Escalera v. Lunn*, 361 F.3d 737, 743-45 (2d Cir. 2004)(applying "corrected affidavit" doctrine to determine materiality of inaccuracies in false arrest claim); *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)(applying the "corrected affidavit" analysis to assess the materiality of inaccuracies in an affidavit in context of a suppression motion); *Kucera v. Tkac*, No. 5:12-CV-264, 2014 WL 6463292, at *13-14 (D. Vt. Nov. 17, 2014)(looking to corrected affidavit in case where Vermont police officer provided

27

inaccurate affidavit to state's attorney's officer to evaluate materiality of inaccuracies for purposes of resolving an abuse of process claim under Vermont tort law). The information that the prosecutors would have known had Shedd provided an accurate affidavit, of course, simply include the information that Shedd knew at the time that she made the arrest, plus the information she acquired after she arrested Simuro but before she drafted and faxed her probable cause affidavit.

Despite the jury's finding that Shedd had "arguable probable cause" at the time that she conducted the arrest, the Court is entitled to reach its own conclusion about whether those facts provide "arguable probable cause" to prosecute. The Court is not persuaded by the suggestion that the facts which Shedd acquired between the time that she made the arrest and the time that she drafted and sent her affidavit independently exonerated Mr. Simuro of suspicions of wrongdoing. The most significant additional fact gathered by Shedd during this period concerns Steven's allegations that Debra was a liar and his assertions that Simuro did not abuse K.S. However, together with the sum of the evidence available before the arrest, the Court finds that these facts, which a corrected affidavit would have set forth, would not provide "arguable probable cause" to prosecute Simuro. First, the Plaintiff's expert testified that

the alleged disclosure by K.S. during Shedd's interview was unreliable because of the poor quality of Shedd's interview technique. Even if the interview is given weight, K.S. stated in the interview that his grandfather touched him over his clothes and on his bum, not under his clothes, contradicting his earlier response to Shedd's questioning. Moroever, without further evidence of Simuro's intentions, his disclosure of washing K.S. directly with his hands does not itself signal that he likely committed a crime. Finally, the Court acknowledges that in many contexts, a child's disclosure of abuse to a trusted adult may be sufficient to give rise to probable cause, even if it is not corroborated by the child's later disclosure of abuse in a subsequent interview with authorities. Nevertheless, the context of Debra's report about K.S.'s alleged disclosure should have given Shedd reason to pause. Debra reported a disclosure allegedly made by K.S. over a year earlier, during an interview in which she was being investigated for endangering her future child, and shortly after her father had forced her to leave his home. Given this backdrop, the Court finds that Debra's report, without further corroboration, would not give rise to probable cause. Thus, the Court finds that the evidence which would have been presented to the prosecution in a corrected affidavit would not give rise to either probable cause or arguable probable

cause.[8] Accordingly, even applying "arguable probable cause"
standard to Shedd's claim for qualified immunity from malicious
prosecution, it concludes that Shedd failed to meet this
standard and is thus not entitled to qualified immunity.

2. *Whether Simuro may move for entry of judgment on malicious
   prosecution, given the limited nature of his motion at
   trial*

Simuro requests that "judgment be entered consistent with the
verdict form under Rules 54 and 58 of the Federal Rules of Civil
Procedure." ECF No. 226, p. 3. He also opposes Defendant Shedd's
request for entry of judgment on the basis of Rule 50 of the
Federal Rule of Civil Procedure. Shedd argues that Simuro waived
the grounds for a post-trial Rule 50(b) motion by failing to
raise the claims he asserts before the submission of the case to
the jury. This argument is clearly misplaced, as Shedd is the
only party that moved this Court for entry of judgment as a
matter of law under Rule 50. Simuro's discussion of Rule 50(b)
constitutes a response to Shedd's motion for entry of judgment

---

[8] The Court recognizes that its reasoning generates friction with the jury's
finding that there was arguable probable cause to arrest Simuro, such that
Shedd is not liable for false arrest. Here, however, Simuro did not challenge
the jury's conclusions on the false arrest claim. Therefore, the Court need
not assess whether there was sufficient evidence to support its verdict on
this claim. As a formal matter, however, its conclusion concerning arguable
probable cause to prosecute do not conflict with the jury's special
interrogatories, which addressed arguable probable cause to arrest, or with
the jury's finding of liability on the malicious prosecution claim.

on this ground. He affirmatively moves only for the entry of
judgment on the basis of the jury's general verdict.

   3. *Whether there was a legally sufficient evidentiary basis*
      *for a reasonable jury to find Defendant Shedd liable for*
      *malicious prosecution*

   Defendant Shedd has moved the Court for a judgment as a matter
of law pursuant to Rule 50(b). Fed. R. Civ. P. 50.[9] Where a jury
has deliberated in a case and actually returned its verdict in
favor of the non-movant, a party seeking entry of judgment as a
matter of law pursuant to Rule 50(b) must overcome a very
burdensome standard. *Newton v. City of N.Y.*, 779 F.3d 140, 146
(2d Cir. 2015). This Court may only grant such a motion if there
exists "such a complete absence of evidence supporting the
verdict that the jury's findings could only have been the result
of sheer surmise and conjecture, or the evidence in favor of the
movant is so overwhelming that reasonable and fair-minded
[persons] could not arrive at a verdict against [her]." *Kinneary*
*v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010). The Court

---

[9] Shedd properly preserved the issues raised in her Rule 50(b)
motion by incorporating by reference the arguments she raised at
summary judgment. The Court denied her pre-trial motion for
entry of judgment as a matter of law on the grounds raised in
her earlier summary judgment motion, asserting in an apparent
reference to the argument for such entry of judgment on the
malicious prosecution claim that, "the ultimate decision was
favorable to the Plaintiff and whether the evidence satisfies
that.  It's an open question frankly. I think there's enough to
get to the jury." ECF No. 223, p. 5.

must consider the evidence in the light most favorable to the
non-moving party and give that party the benefit of all
reasonable inferences that the jury might have drawn in his
favor from the evidence. *Tolbert v. Queens College*, 242 F.3d 58,
70 (2d Cir. 2001)).

The evidence adduced at trial, viewed in the light most
favorable to Simuro, was sufficient to sustain the jury's
finding of liability on the malicious prosecution count under
this heightened standard.   To sustain a § 1983 claim of
malicious prosecution, a plaintiff must demonstrate conduct by
the defendant that is tortious under state law and that results
in a constitutionally cognizable deprivation of liberty. *See
Singer v. Fulton County Sheriff,* 63 F.3d 110, 116–17 (2d Cir.
1995). Under Vermont law, a defendant is liable for malicious
prosecution if the plaintiff demonstrates, by a preponderance of
the evidence, that the defendant initiated the prosecution (1)
without probable cause (2) with a malicious intent, and (3) the
proceeding terminated in plaintiff's favor." *Kent v. Katz*, 146
F. Supp. 2d 450, 461 (D. Vt. 2001), *aff'd in part*, 312 F.3d 568
(2d Cir. 2002); *Lay v. Pettengill*, 38 A.3d 1139, 1151 (Vt. 2011)
(citing *Anello v. Vinci,* 458 A.2d 1117, 1119 (1983)). Shedd
argues that the evidence does not support a finding that she
initiated the prosecution, or that the proceedings terminated in

32

Simuro's favor.[10] Contrary to Shedd's assertion, a reasonable and fair-minded person could conclude, as the jury did, that plaintiff made out these elements by a preponderance of the evidence at trial.

First, viewed in the light most favorable to Simuro, the evidence supported the inference that Shedd interfered with the prosecutor's independent judgment and thereby caused the initiation of the prosecution. "In cases against police officers, 'plaintiffs have overcome the presumption that a prosecutor exercises independent judgment in deciding whether to initiate a criminal proceeding where they have shown that the officer either (1) created false information and forwarded it to prosecutors or (2) withheld relevant and material information.'" *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 163 (2d Cir. 2010) (finding that the initiation element had been met where a defendant had elicited inculpatory statements from witnesses whose veracity in making such statements was circumstantially suspect and forwarded those statements to prosecutors). In order to overcome the presumption of independent judgment, it is not

---

[10] Shedd does not assert that Simuro presented insufficient evidence for the jury to conclude that the prosecution lacked probable cause, or that she acted with malice in causing the initiation of proceedings against Simuro. Nevertheless, the Court finds that a reasonable, fair minded juror could find that Shedd initated the prosecution without probable cause and with malice.

necessary for Plaintiffs to show that the prosecutors themselves acknowledge that they were misled. *See Zahrey v. Coffey*, 221 F.3d 342, 351–52 (2d Cir. 2000) (finding, with respect to a prosecutor who assumed the role of an investigative officer and fabricated evidence leading to a plaintiff's prosecution, that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."). However, "[t]he initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct; in that circumstance, "but for" causation could be claimed to be lacking." *Id.*[11]

---

[11] Thus, the "but for" requirement does not necessitate a finding that if the officer had provided correct information, the prosecution would have reached the same result, since this is established by the absence of probable cause requirement. *See Reichle v. Howards*, 132 S. Ct. 2088, 2097, 182 L. Ed. 2d 985 (2012) (Ginsburg, J. concurring) ("Thus, the causal connection a plaintiff must establish in a retaliatory-prosecution case is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another. This distinct problem of causation justified the absence-of-probable-cause requirement.") (internal quotations and citation omitted). Rather, the "but for" requirement simply necessitates a finding that the same result would not have occurred had the defending

Thus, the testimony of Sand and Neary, the prosecutor assigned to Simuro's case, although relevant, is secondary to other forms of evidence establishing Shedd's causal connection with the prosecution. Rather, the jury could have relied on its own comparison of the videos of Shedd and Keefe's interviews and the affidavit that Shedd presented to the prosecutors in order to find that her affidavit, upon which prosecutors relied, contained both false statements and material misrepresentations. As the Court found in its summary judgment opinion and order, Shedd misstated the content of her interview with K.S. in her affidavit.  Although Erin Keefe testified about the specific discrepancies between Shedd's affidavit and the content of the interviews based on her personal knowledge, the jury could have reached the same conclusions as Keefe based on the non-testimonial evidence at its disposal, without relying on her testimony.

None of the prosecutors involved in this case expressly rejected the proposition that the misstatements in Shedd's affidavit were material to the prosecution's decision to bring charges against Mr. Simuro. In fact, each of these witnesses stated that their office relied on the affidavit in making the decision to prosecute, and Neary testified that Shedd did not

---

officer failed to engage in the misconduct –such as forwarding false information –altogether.

provide her with the interview videos at the time that she made the decision to prosecute Simuro. While it is true that Neary testified that the basis for her charge of lewd and lascivious conduct included facts that were correctly described in the affidavit, she did not testify that she would have brought this charge if, for example, she had been provided with a fully accurate affidavit and had determined not to bring charges on the other grounds. Thus, the jury could have found that the totality of the affidavit, including statements included in the affidavit which were made in error, could have led to Neary's decision to charge even on the lewd and lascivious count. Accordingly, it cannot be said that a reasonable and fair-minded person could not have found that evidence of Shedd's misconduct overcame the prosecutor's independent judgment, and thus that Shedd caused the initiation of the prosecution.

Shedd also asserts that "there is a significant evidentiary gap for showing favorable termination." ECF No. 234, pg. 7. Vermont courts follow "the Restatement view that one must consider the circumstances under which the proceedings are withdrawn in deciding whether the withdrawal or abandonment of a civil suit constitutes a favorable termination. *Lay v. Pettengill*, 38 A.3d 1139, 1152 (Vt. 2011) (quoting *Siliski v. Allstate Insurance Co.*, 811 A.2d 148, 152 (Vt. 2002). "[I]f the dismissal somehow indicates that the defendant is innocent of

wrongdoing, it will be considered a favorable termination." *Id.*
Shedd is correct that the Second Circuit, in discussing the
standard for favorable termination employed in the state of New
York, has held that a dismissal "in the interests of justice"
does not constitute a favorable termination. *See Singer v.
Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (citing
*Hygh v. Jacobs,* 961 F.2d 359, 368 (2d Cir.1992)). However,
Simuro's charges were not dismissed in the interest of justice
as a legal matter. Rather, a single witness –Sand –testified
that he wrote letters to the judges in Simuro's case in order to
correct the miscarriage of justice that he believed had occurred
in allowing the prosecution to proceed. Even if the court
presiding over Simuro's case, rather than Sand, had expressed
that its dismissal was "in the interest" of justice, the jury
would still be entitled to consider the circumstances
surrounding the dismissal in determining whether the proceedings
terminated favorably to Simuro under Vermont law. *See Lay*, 38
A.3d at 1152.

   Although the procedural disposition of Simuro's case by the
Court did not reflect on Simuro's innocence as a legal matter,
the jury could have found that the circumstances surrounding the
dismissal, including the prosecutors' views of the case,
reflected negatively on the merits of the case. The case was
dismissed after Simuro's counsel filed two motions to dismiss

raising substantive allegations of Simuro's innocence. Neary testified that, in light of the arguments raised in those motions, she intended to file motion to dismiss the charges on behalf of the state. Sand, who served as Neary's boss and was ultimately responsible for the functioning of the State's Attorney's office, testified that he had determined that the available evidence did not establish probable cause to believe Mr. Simuro was guilty. Although it is also plausible, as Shedd alleges, that Sand was not an aggressive prosecutor generally and that he rarely brought cases of sexual abuse to trial, there was sufficient additional evidence of the prosecutors' assessment of the merits of the case at issue for a reasonable, fair-minded juror to conclude that the proceedings terminated favorably to Simuro. Accordingly, the Court denies Shedd's motion for judgment as a matter of law, and orders that judgment be entered in accordance with the jury's general verdict on this claim.

   4. *Whether the Court's instruction on K.S.'s claim of*
      *unreasonable seizure was erroneous, and therefore warrants*
      *a retrial*

Separately, K.S. moves the Court for a retrial pursuant to Rule 59 of Federal Rules of Civil Procedure on the ground that the Court's instruction to the jury pertaining to K.S.' sole claim for relief was erroneous. Rule 59(a)(1)(A) permits courts,

upon motion, to grant a new trial on all or some of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). An erroneous jury instruction requires a new trial unless the error is harmless. *Rasanen v. Doe*, 723 F.3d 325, 331–32; *Cobb v. Pozzi*, 363 F.3d 89, 112 (2d Cir. 2004). "As a general matter, no particular wording is required for a jury instruction to be legally sufficient, but rather, this Court must look to the charge as a whole to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law." *U.S. v. Gabinskaya*, 829 F.3d 127, 132–33 (2d Cir. 2016) (internal citation omitted). Even where an instruction is not erroneous, a new trial is warranted if the failure to give an instruction requested by a party was supported by some evidence and its omission in the charge was prejudicial. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

K.S. asserts that the jury instruction on K.S.'s claim of unreasonable seizure was erroneous because it prevented the jury from finding that Shedd caused K.S.'s unlawful seizure by precipitating the filing of criminal charges and the setting of restrictive conditions of release. However, the instruction that K.S. raised at trial, and which he now claims should have been provided, would not have permitted a finding of liability on

this ground. Two elements of the Court's charge on K.S. claim
are relevant to this allegation. First, the court instructed the
jury on the requirement that "Shedd caused the seizure of K.S."
This instruction stated as follows:

> The removal of a child from the custody of his guardian is a
> seizure under the Fourth Amendment. You should refer to the
> instructions above to determine whether Shedd caused this
> removal of K.S. from the custody of his guardian.

The earlier causation instruction provided as follows:

> In order to hold the Defendant responsible for paying damages
> to the Plaintiff, you must establish that the Defendant's acts
> were the actual and proximate cause of the injury suffered by
> the Plaintiff. An act is the actual, or "but for", cause of
> injuries if the harm would not have occurred but for the
> Defendant's conduct, such that the Defendant's acts were a
> necessary condition for the occurrence of the Plaintiff's
> harm. An act is a proximate cause of an injury if it was a
> substantial factor in bringing about that injury, and if the
> injury was a reasonably foreseeable consequence of the
> Defendant's acts.

In addition, the Court instructed the jury on whether the
seizure was unreasonable as follows:

> In the context of seizures of children by child protective
> services agencies, the removal of a child from his parents' or
> guardians' custody is generally considered to be reasonable
> when it is executed pursuant to a court order. However, when
> state law does not authorize the removal of a child, the
> seizure is unreasonable for constitutional purposes even if
> executed pursuant to a court order. If a family court's
> decision is based upon a petition for removal which includes
> intentionally or recklessly false statements, the removal of
> the child may not be authorized by state law, and may
> therefore be unreasonable.
> When the seizure is not executed pursuant to a court order,
> it must be based on probable cause. If the information
> possessed by the officer causing the seizure would have
> warranted a person of reasonable caution in the belief that

the child was subject to the danger of abuse if he were not
seized before court authorization could reasonably have been
obtained, his removal should be considered reasonable.

K.S. asserts that the instruction failed to permit the jury
to find Shedd liable if the jury concluded that Shedd's probable
cause affidavit was never included in the family court file.
Although K.S. asserts that the erroneous instruction *on
causation* went directly to K.S.'s claim, ECF No. 227, p. 17,
K.S. did not object to the causation instruction at trial. Nor
did K.S. object to the general framing of the unreasonable
seizure instruction, which essentially distinguished between
seizures by child protective services agencies pursuant to a
relevant court order and seizures not executed pursuant to such
a court order. Rather, he submitted an instruction stating:

> If you find, by a preponderance of the evidence, that
> Defendant Shedd supplied intentionally or recklessly false
> statements that led to the issuance of a Family Court order,
> the removal of the child may not be authorized by law and may
> therefore be unreasonable.

Contrary to K.S. assertions, the jury instruction provided by
the Court was consistent with the law of this Circuit. In fact,
K.S. does not put forth a plausible argument to find that the
instruction would be erroneous per se. The Second Circuit has
repeatedly held that where a removal of a child by a family
court is not authorized by state law, it is not "reasonable" for
Fourth Amendment purposes. *Nicholson v. Scoppetta*, 344 F.3d 154,
176 (2d Cir. 2003) ("Plainly, if New York law does not authorize

41

the removals the plaintiffs complain of, there can be no probable cause to carry out the removal. State law, then, is potentially dispositive of this issue."). Where a family court order is obtained by virtue of false statements or representations, it may not be authorized by state law, and may therefore be unreasonable. *Id; see also Estiverne v. Esernio-Jenssen,* 833 F. Supp. 2d 356, 379 (E.D.N.Y. 2011). Moreover, where the seizure of a child is carried out without a court order, the Second Circuit has declined to depart from the "probable cause" standard required for most seizures. *Tenenbaum v. Williams*, 193 F.3d 581, 603-05 (2d Cir. 1999); *Southerland v. City of New York*, 680 F.3d 127, 158 (noting that "subsequent to *Tenenbaum,* we have assumed that the standard to be applied to such claims cannot be any less than probable cause," but later holding that it need not decide whether the facts of that case warranted the application of a different legal standard). Each of these propositions mirrors the Court's instructions in the jury charge, and K.S. does not object to them on the ground that they are inconsistent with existing law. Thus, the Court finds no legal error in the instructions themselves.

The Second Circuit has not considered a case presenting a theory akin to the one put forth by K.S. in this case: namely, that an officer can cause the seizure of a child by falsely arresting his caretaker, thus prompting a family court to award

42

custody to child protective services. Even if such a claim were
legally plausible, the inclusion of the proposed instruction in
this case would not have substantially altered the grounds upon
which Shedd could be found liable. The Court's instructions
permitted the jury to find Shedd liable even if the family
court's decision to place K.S. into DCF custody was not based on
a direct review of her probable cause affidavit, so long as the
misstatements made by Shedd were reflected in the materials
reviewed by the judge granting DCF custody. The word choice in
the Court's instruction – that the removal of a child may not be
authorized by state law and may therefore be unreasonable if a
family court's decision *is based upon* a petition for removal
*which includes* intentionally or recklessly false statements –
and the instruction offered by the Plaintiff –that the same
result would hold if intentionally or recklessly false
statements *led to the issuance of* a Family Court order –are
insignificant in light of the Court's additional cross-reference
to the broadly-framed causation standard. Indeed, Shedd's
intentionally or recklessly false statements could only have *led
to the issuance of* the family court order if they were somehow
reflected in DCF's petition and considered by the Family Court.
If there were evidence that Keefe's petition would have differed
had she not had access to Shedd's affidavit, or that Shedd's
false statements were reflected in any DCF filings considered by

the family court, the theory that Shedd's false statements led
to the issuance of the family court order would have been
plausible.  Here, however, K.S. failed to present such evidence.

   To the extent that K.S. attempts to argue that the
instructions precluded the theory, embraced by the Court as a
possibility in its order on Shedd's pretrial motion for judgment
on the pleadings, that Shedd caused the seizure by causing the
imposition of conditions of release that prevented Simuro's
contact with K.S., this theory is also now precluded by the
evidence. Here, Simuro's prohibition on contact did not itself
leave K.S. in the hands of DCF. Rather, K.S. first remained in
Steven's care. It was only after Steven interfered with Debra's
contact with K.S. that DCF attempted to place K.S. into the care
of the agency. Therefore, the jury could not have found that the
mere separation of Simuro from K.S., produced by the conditions
of released imposed as a consequence of the criminal proceedings
initiated by Shedd, itself caused K.S.'s seizure. Even if the
proffered instruction would have permitted the jury to consider
this theory more thoroughly (which the Court finds, in light of
the causation instruction provided, was not the case), a new
trial would not be warranted because such a theory would not be
supported by the evidence adduced at trial. *See Anderson*, 17
F.3d at 557 ("[A] party needs to show . . . that there is some

evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury.").

Furthermore, the second component of the instruction, which addressed seizures of children that do not directly result from a court order awarding custody to a child protective services agency, permitted the jury to consider K.S.'s theory that Shedd caused his seizure prior to DCF's custody award. In this case, the jury would have been required to find that any seizure of K.S. which occurred prior to the issuance of the family court order was not supported by probable cause. The jury's denial of liability on Simuro's false arrest claim is consistent with a finding that, to the extent that K.S. was seized prior to the issuance of a family court order, this seizure was supported by probable cause. Since the Court's instructions were not erroneous, and K.S.'s proffered instruction was not necessary for the jury to consider the only theories of liability which would be viable in light of the evidence adduced at trial, the existing instruction cannot be prejudicial. Accordingly, the Court denies K.S.'s request for a new trial.

## 5. Attorneys' fees

The Court need not address Simuro's claim for attorneys' fees at this stage. Rather, the Court will postpone consideration of

the Plaintiff's petition until after the parties have been given an opportunity to fully brief the relevant issues.

### Conclusion

For the foregoing reasons, the Court hereby **grants** Simuro's motion for entry of judgment pursuant to the jury's general verdict and **denies** Shedd's motion for judgment as a matter of law. Furthermore, the Court **denies** K.S.'s motion for a new trial.

Dated at Burlington, in the District of Vermont, this 7th day of March, 2017.


/s/ William K. Sessions III
William K. Sessions III
United States District Court